## MATTER OF BALLESTER-GARCIA

### In Exclusion Proceedings

### A-24452248

### *Decided by Board December 17, 1980*

(1) Under section 243(h)(2)(C) of the Immigration and Nationality Act, 8 U.S.C. 1253(h)(2)(C), as amended by the Refugee Act of 1980, it is not always necessary to determine whether an applicant for this relief has actually committed a serious, nonpolitical crime: it is enough, by the very terms of the statute, to find that there are "serious reasons for considering" that he has committed such a crime.

(2) Where a crime is not obviously heinous, such factors as the alien's description of the crime, the turpitudinous nature of the crime according to our precedents, the value of any property involved, the length of the sentence imposed and served, and the usual punishments imposed for comparable offenses in the United States, are all proper considerations in attempting to decide whether or not that crime may have been serious within the meaning of section 243(h)(2)(C).

(3) Where respondent's crime involved the late night entry into a building, and the theft of over 12,000 pesos, where the crime had been plotted several weeks in advance, and where the applicant was sentenced, in Cuba, to 15 years imprisonment, of which he had served 8 when released to come to the United States, there are serious reasons to believe the respondent's crime was a serious one, and he is thus ineligible for section 243(h) relief.

EXCLUDABLE:
Order:   Act of 1952—Sec. 212(a)(9) [8 U.S.C. 1182(a)(9)]—Admitted to conviction of a crime involving moral turpitude
Sec. 212(a)(20) [8 U.S.C. 1182(a)(20)]—Not in possession of a valid immigrant visa

ON BEHALF OF APPLICANT:   Pro se

BY:   Milhollan, Chairman; Maniatis, Appleman, and Maguire, Board Members

In a decision dated August 5, 1980, an immigration judge found the applicant excludable as charged, denied his application for asylum, and ordered him excluded and deported. The applicant appealed. The appeal will be dismissed.

The applicant is a 32-year-old native and citizen of Cuba. He was part of the recent exodus from Cuba, arriving in the United States at Key West, Florida, on May 9, 1980. Shortly after his arrival in this

country, the applicant executed a sworn statement and a request for asylum. These documents reflect that the applicant admitted that he had been convicted in Cuba in 1972 for what he called "robbery," in that he, along with three other men, took 12,230 pesos from a cabaret. The applicant was sentenced to 15 years imprisonment for this crime, and was in prison up until the time he was put on a boat to come to this country. Based on these facts, the applicant was charged with excludability under section 212(a)(9) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(9), as an alien who had been convicted of a crime involving moral turpitude, to wit, robbery, as well as under section 212(a)(20). On July 8, 1980, the Department of State informed the Immigration and Naturalization Service that it believed the applicant had committed a serious nonpolitical crime prior to his arrival in the United States, and that he was therefore not eligible for asylum under the United Nations Convention and Protocol. On July 15, 1980, the District Director denied asylum based on the applicant's admission of an arrest and sentence for the commission of a serious nonpolitical crime.

At an exclusion hearing held on August 5, 1980, at which the applicant elected to proceed without counsel, the applicant admitted that he had taken money from the cabaret, and stated that he and his friends had planned the crime 15 to 20 days in advance of committing it. Tr. at 21. Although the applicant referred to his crime as "robbery" in both his sworn statement and his asylum application, and this is the crime mentioned in the I-122 "Notice to Applicant for Admission Detained for Hearing Before Immigration Judge," the crime as described at the hearing appears to have been larceny or burglary. The applicant stated that he and his friends entered the cabaret after 1:00 a.m. in the morning of May 21, 1972, that the door had been left open by one of the criminals, who apparently worked at the cabaret, and that no other persons were in the cabaret at that time. Tr. at 19. The applicant testified that no one carried any weapon, as none was needed, and that they simply entered the building and took the money, which they had information was under some boxes under a table. Tr. at 19-20. The four men involved in the crime were to have divided the money the next day, but were apprehended before they were able to do so. The applicant claimed that he committed the crime in order to pay a smuggler to bring him to the United States. Tr. at 22. Following the applicant's testimony, the immigration judge rendered his decision in which he found the applicant excludable as charged, and ineligible for asylum because of his commission of a serious nonpolitical crime. He found the applicant's testimony with regard to his reasons for stealing the money to be a "self-serving statement" and "unlikely and highly incredible," and he found the applicant in general not to be a credible

witness. Based on the respondent's admissions regarding the commission of his crime, we affirm the immigration judge's finding of excludability.

Section 243(h) of the Act, 8 U.S.C. 1243(h),[1] regarding withholding of deportation, provides that an alien may not obtain this relief, despite a valid persecution claim, if it is determined that, *inter alia*, "there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." Section 243(h)(2)(C). *See also* 8 C.F.R. 208.7(f)(1)(v); *Matter of Rodriguez-Palma*, Interim Decision 2815 (BIA 1980). In the present case, the applicant has freely admitted the details of his conviction for the crime of stealing a considerable amount of money, although he now claims that he committed the crime only to enable him to escape the political situation in Cuba, and he states that he would never have committed such a crime in this country. The issue facing us, then, is whether, under these facts, it can be said that there are serious reasons for considering that the applicant's crime was a serious one.

Finding the answer to this question is made much more difficult by the poor state of the record. Unfortunately, inadequate records are the norm in the many cases we have recently seen dealing with the sudden influx of aliens from Cuba who have admitted to criminal records in that country. It is not surprising that there are no actual conviction records relating to these aliens, but that fact makes it at times extremely difficult to apply the provisions of section 243(h)(2)(C). We must rely in these cases almost entirely on the alien's statements regarding the nature of his offense. This raises additional problems because often the alien's testimony by the time he appears at his exclusion hearing is very different from the statements he made when initially interviewed by Service officers. The immigration judge, and later this Board, must therefore attempt to determine which version of events is most truthful, a troublesome task at best. Then, too, the terms used by these aliens to describe their crimes often appear to be technically inaccurate, especially in those many cases where robbery, burglary, theft, and/or larceny are involved; those terms are bandied about by the aliens (and sometimes by immigration officials as well) with little or no regard for or knowledge of their real meaning. Again, it is left to the immigration judge, and later to this Board, to decipher exactly what crime was involved in a given case. Finally, we are not

[1] Technically, the applicant applied for asylum, and no mention was made at the hearing of section 243(h) relief. However, the regulations provide that asylum requests in deportation or exclusion proceedings "shall also be considered as requests for withholding exclusion or deportation pursuant to section 243(h) of the Act." 8 C.F.R. 208.3(b) (effective June 1, 1980).

provided with any Cuban law which could shed light on an alien's crime, or on how the present Cuban government views given crimes, i.e., whether the regime in general treats the same crimes in the same way vis-a-vis sentencing, and whether the sentences meted out reflect the government's views on the seriousness of the crimes.[2]

There is no scapegoat on whom to pin the blame for the sorry state of these records. Circumstances beyond anyone's control are in the main responsible. Our task is simply to sift through the records in an attempt to ascertain, as far as possible, the accurate facts, and then to determine whether, under those facts, the alien is eligible for withholding of deportation and/or asylum. Under the statute, we need not necessarily determine whether an alien has actually committed a serious nonpolitical crime: it is enough to find that there are "serious reasons for considering" that he has committed such a crime. In a case such as the present one, where there is no doubt that a crime has been committed, we look to the facts, as we have found them to be accurate, to determine whether there are serious reasons to consider that the crime committed was a "serious" one. Where a crime such as murder or armed robbery is at issue, we are unlikely to have much trouble in making this determination. Most of the cases, however, are not so easy. Where the crime is not obviously heinous, perhaps involving an offense against property only, determining the seriousness of the crime becomes a difficult task. In these situations, such factors as the alien's description of the crime, the turpitudinous nature of the crime according to our precedents, the value of any property involved, the length of sentence imposed and served, and the usual punishments imposed for comparable offenses in the United States, are all proper considerations in attempting to decide whether or not a crime may have been serious.

In the present case, we have concluded that there are in fact sufficient facts to show that the applicant's crime may have been a serious nonpolitical one within the meaning of section 243(h)(2)(C). Although the applicant's crime does not appear to have been what is generally considered robbery (as he called it), since no force or threat of force against any person was used (see, e.g., Matter of Rodriguez-Palma, id., 77 C.J.S. Robbery, section 2 (1952)), it did involve the late night entry into a building, and it did involve a very large sum of money. Moreover, although we are not certain of the usual terms of sentence for such crimes in Cuba, we consider significant the facts that the applicant was sentenced to 15 years imprisonment for this crime, and that he had served 8 years when he was released to come to the United States. The

---

[2] We note, for example, that in many of these cases, long sentences, 10 years and more, are given for crimes that, from the aliens' descriptions, appear to be only simple larcenies.

carefully plotted manner in which the crime was planned, several weeks in advance, is also a consideration which indicates the seriousness of the crime here. These factors combine to convince us that there are serious reasons to believe that the applicant's crime in Cuba was a serious one. We reach this conclusion whether the traditional view or the balancing test referred to in *Matter of Rodriguez-Palma, id.,* is applied.[3]

In deciding this case, we have not relied on the advisory opinion from the Department of State.

As the applicant is ineligible for the relief he seeks, his appeal must be dismissed.

ORDER: The appeal is dismissed.

---

[3] We note that the applicant's application for asylum reflects that he would be jailed if returned to Cuba only, "To finish out my sentence," that he fears persecution because, "Since I am an ex-convict, I am a danger to the state," that he has not been active in any organizations hostile to the Cuban government, nor spoken out against the government, and that none of his family members have suffered due to his actions.