**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JIANG GUAN,

*Petitioner*,

v.

WILLIAM P. BARR, Attorney General,

*Respondent.*

No. 17-71966

Agency No.
A206-341-685

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted February 4, 2019*
Pasadena, California

Filed May 30, 2019

Before: Ronald M. Gould and Jacqueline H. Nguyen,
Circuit Judges, and Roger T. Benitez,** District Judge.

Opinion by Judge Nguyen

---

* The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

** The Honorable Roger T. Benitez, United States District Judge for the Southern District of California, sitting by designation.

## SUMMARY[***]

### Immigration

The panel denied Guan Chiang's petition for review of the Board of Immigration Appeals' denial of asylum and withholding of removal on the basis that there were serious reasons for believing he committed a serious nonpolitical crime, and granted in part the petition as to the Board's denial of protection under the Convention Against Torture, and remanded.

The panel held that there were serious reasons to believe that Guan committed a serious nonpolitical crime, where he was involved in a financial scheme embezzling public funds. The panel held that Guan was therefore statutorily ineligible for asylum and withholding of removal.

As to the issue of whether Guan's crime was nonpolitical, the panel held that Guan did not rebut the presumption that his embezzlement crime was a serious nonpolitical crime because he failed to establish that it had a political aspect or objective, and admitted that his involvement in the scheme stemmed from purely economic reasons. Rejecting Guan's contention that his crime was political in nature because the accusations against him were pretextual, the panel explained that Guan conflated a politically motivated *prosecution* with a politically motivated *crime*.

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

As to the issue of whether there were "serious reasons" or probable cause to believe that Guan committed a serious nonpolitical crime, the panel held that there was probable cause, where Guan testified that he knew from the beginning that the purpose of the scheme was for public money to be embezzled and that the scheme was illegal.

The panel also held that Guan failed to establish that he was deprived of due process at his hearings, or that his counsel provided him with ineffective assistance.

The panel held that Guan failed to meet his burden for CAT protection based on his fear of torture in connection with his possible disclosure of alleged corruption by Chinese government officials, explaining that Guan had not identified any actions that he took in the United States to expose the alleged corruption by Chinese government officials, and torture does not include pain or suffering arising only from, inherent in, or incidental to lawful sanctions, including the death penalty.

However, the panel remanded Guan's CAT claim based on his fear of torture in connection with his Christian beliefs, explaining that even if the Board properly rejected on adverse credibility grounds Guan's testimony concerning his past harm in China due to his religious beliefs, the Board failed to address evidence in the record supporting Guan's CAT claim, including evidence that Guan is currently a practicing Christian and that such individuals face a risk of torture in China.

## COUNSEL

Gita Beri Kapur, Law Offices of Gita B. Kapur, Los Angeles, California, for Petitioner.

Aric A. Anderson, Trial Attorney; Emily Anne Radford, Assistant Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

NGUYEN, Circuit Judge:

Guan Jiang, a native and citizen of China, seeks review of a Board of Immigration Appeals ("BIA") decision denying him asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").

We deny the petition as to Guan's claims for asylum and withholding of removal. Substantial evidence supports the agency's determination that Guan committed a serious nonpolitical offense and is therefore statutorily ineligible for asylum and withholding of removal. As to Guan's claim for relief under CAT, however, the IJ failed to consider evidence from Guan's church that he is a practicing Christian and evidence from the country reports that Christians are persecuted and tortured in China. Therefore, we grant the petition in part and remand to the BIA for further consideration of CAT relief.

## I. Factual Background

### A. Guan's Introduction to Christianity

Guan grew up in Qingdao, China, where his grandmother raised him "to know the Christian faith." Guan had "a positive impression of Christianity," but he "did not understand the religious meaning." When his grandmother died in 2001, Guan "kept her Bible as a keepsake." Guan read the Bible but lacked "a deep comprehension of it."

Years later, Guan ran into a childhood friend, Zhang Zhen, who told Guan about church gatherings that Zhang attended every weekend at a private home. Guan accompanied Zhang to a church meeting "out of curiosity" in May 2007. At the meeting, Guan was able "to truly understand God." The congregants at the house church "sang hymns, read the Bible, shared testimonies, loved one another[,] and . . . were very happy."

Guan attended the church meetings once or twice a month and eventually on a weekly basis. Guan knew that his church was not officially registered but "figured that . . . [he] could continue to participate" because they "had not done anything wrong." Guan claimed that he "became a Christian" when he was baptized in December 2007.

### B. Guan's Participation in the Pyramid Scheme

In January 2009, Guan had dinner with his uncle, Guan Fengkun ("Uncle Fengkun"), where he met several local government officials, including Mayor Yu Jiantai and the director of the propaganda department, Naipeng Jiang. A few days later, Guan met with Director Jiang and Uncle Fengkun in his uncle's office. Jiang told Guan that the officials, led by Mayor Yu, were planning to form an

investment company "to put together [their] money" and use it for infrastructure projects in Qingdao.

Jiang explained that it was "not appropriate" for a government official to manage the company, so they needed to find a private citizen to do it. Guan agreed to become involved because it was a "rare" and "precious" opportunity for a young merchant like him to become acquainted with so many government officials, and he "had a lot of money on hand and . . . wanted to do some business."

The following month, Mayor Yu provided office space for the venture by ordering the administration of industry and commerce to vacate its existing premises. A few days later, Guan received all of the licenses and permits necessary to operate the Jintailong Investment Company. Mayor Yu's secretary, Chen Xing, gave Guan detailed instructions about what the company would need to do and explained the different processes for handling funds raised from the public versus those invested by the government officials' relatives. Chen asked Guan to keep these details secret from the public.

Jintailong opened in July 2009. The company was registered in Guan's name, and Guan seeded it with a ¥5 million investment from his own funds. Jintailong's clients included both members of the general public and—at least nominally—the relatives of government officials. A "large amount of cash" invested in Jintailong in the name of the officials' relatives and friends was in fact made by the government officials themselves and derived from "public money [that they had] embezzled . . . and their illegal income."

During the company's first five years, it collected around ¥80 million from the general public and ¥700–900 million

from the officials' family members. On the 18th day of each month, Guan collected the investors' money and delivered it to Mayor Yu via Secretary Chen or Director Jiang. Secretary Chen set aside some of the money, approximately ¥300,000–400,000 per month, to pay interest to Jintailong's investors, which Guan brought back to Jintailong. Guan knew that Jintailong lacked the qualifications to receive public deposits or loans but did not worry because he received his orders from government officials and he believed that there were "several million companies like this."

Mayor Yu and the government officials invested the money from Jintailong in construction projects and residential community development. However, these projects used "[i]nferior materials" and "substandard products." The development forced families to relocate and accept compensation at less than fair market value. When "numerous civilians" gathered to petition the government, Mayor Yu had the Public Security Bureau ("PSB") suppress them.

## C. Guan's Bar and Nightclub Business

When Jintailong had been operating for a year, Mayor Yu brought in Sun Tao, a local gang leader with an extensive criminal record, as a manager. Although Sun was nominally tasked with safeguarding the large amount of cash flowing through the company each day, he actually functioned in a supervisory capacity. He led "a number of social idlers and former prisoners to control the supply of cement, sand, and gravel for the development of various living communities," and had gang members "take responsibility [for] the security of construction sites."

After Sun's arrival at Jintailong, Guan wanted to leave the company. He began coming into the office only on

Wednesdays. His participation in Jintailong's affairs was limited to the monthly handovers of investment cash and quarterly handovers of expired investment contracts and company income statements.

In September 2010, Guan rented a building in which to start Heshuo Entertainment—a bar and nightclub business. In early 2011, he told Uncle Fengkun about his plan to resign from his position at Jintailong and no longer serve as its legal representative. A few days later, Guan attended a dinner at which Mayor Yu implicitly threatened to kill Guan if he left the company.

The next day, Guan went to Director Jiang's office, where PSB Political Commissar Shi Dexin convinced him not to leave Jintailong. Shi told Guan: "[W]ork hard for [Mayor Yu]. Develop your own business while taking care of the company at the same time." Shi cautioned Guan that the government officials would not let him go because he "knew too much."

Mayor Yu fast-tracked the licensing process for Heshuo Entertainment, which opened in July 2011. Guan was in charge of Heshuo's day-to-day management. The business flourished, and Guan spent most of his time there.

## D. Guan's Arrest for Religious Activity

In December 2010, before Heshuo had officially opened, Guan's church group began meeting there every Sunday to accommodate its growth. On January 27, 2013, a group of police raided one such gathering and arrested everyone present. The police accused the congregants of "having an illegal gathering," "spreading evil cult activities," and disrupting social order. Guan was taken to the PSB and detained for three days. Three officers handcuffed and

interrogated Guan.  When he refused their order to kneel, the officers grabbed him by the hair and kicked him in the legs to force his compliance.  For the next three to four hours, the officers alternatively beat Guan with a baton and interrogated him, leaving him dizzy and "writhing in pain."

Around 4:00 the next morning, the three officers interrogated Guan again.  The officers handcuffed him to an overhead bar, forcing him to stand with his arms raised and his feet barely touching the ground for about five hours.  During this time, the officers struck Guan with the baton many times on his head, shoulders, legs, and stomach.  Guan admitted to the officers' allegations only because he "could no longer endure the torture."

## E. Guan's Travel to the United States

The police released Guan on January 30, 2013, after his wife paid ¥20,000 and Guan signed a letter admitting to his alleged crimes involving the church.  As a condition of release, Guan was required to report to the police every week so that they could monitor him, which was "very painful" for his family because each time they worried that he would be detained, beaten, or sentenced.  Guan was prohibited from organizing, assisting, and participating in religious activities, disseminating cult speeches, and contacting his church friends.

The day after his release, Guan was treated at the hospital for injuries to his face and head, multiple soft tissue contusions on his body, swelling on his legs and wrists, an inability to lift his left arm, and a fracture to his eighth right rib.  He received a CT scan on his head and medication for the swelling and inflammation.

Guan submitted a complaint to the city on February 5, 2013, but officials at the complaint office told him that the matter was outside their jurisdiction and that he should speak with the procuratorate office.[1]  Thereafter, police officers would search Heshuo Entertainment every few days.  They "turned [it] upside down and sometimes just took products," scared off his customers, and soon ruined his business.  Fearing re-arrest, Guan and his wife made plans to escape the country.

Guan last worked at Jintailong in March 2013.  The government officials stopped paying him in April 2013 because he had used the business permit specially authorized by Mayor Yu to engage in church activities, which they feared would threaten their positions.

Guan traveled to the United States via Hong Kong in October 2013.  Since arriving in the United States, he has regularly attended a Lutheran church in Monterey Park.

### F.  China's Extradition Request

After Guan arrived in the United States, he heard from his parents that the police were "infuriated" by his failure to report and other violations of supervised release.  The police often came to Guan's home to check on his whereabouts.  They asked his father to persuade him to surrender immediately and threatened that they would "eventually catch [Guan] and bring [him] to justice by sending [him] to

---

[1] As of October 2010, Chinese law provided that "law enforcement and administrative operations of criminal detention facilities such as the detention, exchange of custody, and incarceration of criminal suspects or defendants shall be subject to the legal supervision of the procuratorial authorities."

[a] reeducation labor camp for the rest of [his life]." Guan lived "in deep fear" of this.

China issued an Interpol Red Notice seeking Guan's extradition in January 2014.[2] The Red Notice alleged that Guan "illegally received public deposits with high interest promise" through Jintailong, knowing that the company "did not have the qualification to receive public deposits or grant loans." It further alleged that Guan "and other suspects illegally received public deposits of [¥]97 million from 570 persons."

Around the beginning of June 2014, Guan learned from his attorney that he was wanted by the Chinese authorities. Guan called Uncle Fengkun and various government officials to find out what was going on. He learned that in October 2013, the government authorities dismantled Jintailong after Guan failed twice to show up for reporting. Guan claims that he will be executed if he returns to China.

## II.  Procedural History

In April 2014, four days before Guan's visa expired, he applied for asylum, withholding, and CAT protection, claiming that he feared persecution by the Chinese government due to his Christian religion and his hosting an

---

[2] "A Red Notice is a request to locate and provisionally arrest an individual pending extradition. It is issued by [Interpol's] General Secretariat at the request of a member country or an international tribunal based on a valid national arrest warrant." Interpol, Red Notices, https://www.interpol.int/INTERPOL-expertise/Notices/Red-Notices. Although a Red Notice "is not an international arrest warrant," *id.*, it "is the closest instrument to an international arrest warrant in use today." Department of Justice, Criminal Resource Manual § 611, https://www.justice.gov/jm/criminal-resource-manual-611-interpol-red-notices.

unregistered house church. The government commenced removal proceedings in June 2014 and took Guan into custody in 2016.

To support his claim, Guan offered his own testimony and various evidentiary exhibits, including country reports and a letter from the leader of his church in the United States. Guan's October 2016 merits hearing was cut short when, after the morning session had ended, the IJ learned that Guan had been fasting in solidarity with his "blood brother." The IJ, concerned that the fasting could affect Guan's ability to concentrate, continued the hearing to ensure that Guan was "healthy and ready to go." The IJ also continued the subsequent merits hearing when it became clear that the interpreter spoke a different dialect than Guan and was having difficulty communicating with him. Guan completed his testimony at a January 2017 merits hearing.

The IJ determined that Guan was ineligible for asylum and withholding of removal based on religious persecution. The IJ found that Guan was "not . . . a credible witness and [did] not afford his testimony any weight." The IJ based the adverse credibility finding on inconsistencies in Guan's statements about whether he knew that his participation in Jintailong was misconduct or criminal activity. Alternatively, the IJ found probable cause to believe that Guan committed a serious nonpolitical offense in China based on Guan's admissions and the arrest warrant. The IJ found that there was "no political aspect to [Guan's being accused] of committing a crime in China" and that in arguing otherwise, Guan "conflated a request for asylum based upon

his Christian beliefs with the [Chinese] arrest warrant" for an economic crime.[3]

The following month, the IJ also denied CAT relief. The IJ found that Guan failed to show a likelihood of being tortured in China because of his religious beliefs "for all the reasons stated in [the] decision regarding asylum and withholding of removal." In addition, the IJ found Guan ineligible for CAT relief based on his anticipated death sentence for economic crimes because "any punishment flowing from [his crimes] would constitute lawful sanctions."

The BIA affirmed the IJ's rulings regarding asylum, withholding of removal, and CAT relief on the grounds that Guan lacked credibility, there was probable cause to find that he had committed a serious nonpolitical offense in China, and he had failed to show that he would more likely than not be tortured if he returned to China. The BIA rejected Guan's additional argument that he was denied due process because the IJ relied on testimony he gave while fasting and having difficulty with the interpreter and because his counsel failed to object to the admission of the asylum officer's notes.

## III. Jurisdiction and Standard of Review

We have jurisdiction over final orders of removal pursuant to 8 U.S.C. § 1252. The BIA's legal determinations are reviewed de novo and its factual findings for substantial evidence. *Diaz-Jimenez v. Sessions*, 902 F.3d 955, 958 (9th

---

[3] The IJ also found Guan's testimony that he had been harmed and feared further harm in China on account of his religious beliefs to be unpersuasive and lacking corroboration. Because the BIA did not reach this ground, we do not consider it here. *See INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002).

Cir. 2018).  To the extent the BIA reviewed the IJ's decision and incorporated portions of it as its own, we treat the incorporated parts of the IJ's decision as the BIA's.  *Parada v. Sessions*, 902 F.3d 901, 909 (9th Cir. 2018).

## IV.  Discussion

## A.  Asylum and Withholding of Removal

An applicant is ineligible for asylum and withholding if there are "serious reasons" to believe that he "committed a serious nonpolitical crime" outside the United States prior to his arrival.   8 U.S.C. § 1158(b)(2)(A)(iii) (asylum); *id.* § 1231(b)(3)(B)(iii) (withholding).   The "serious reasons" standard is "tantamount to probable cause." *Silva-Pereira v. Lynch*, 827 F.3d 1176, 1188 (9th Cir. 2016) (quoting *Go v. Holder*, 640 F.3d 1047, 1052 (9th Cir. 2011)).

## 1.  Serious Nonpolitical Crime

"[A] 'serious non-political crime' is a crime that was not committed out of 'genuine political motives,' was not directed toward the 'modification of the political organization or . . . structure of the state," and in which there is no direct, 'causal link between the crime committed and its alleged political purpose and object.'" *McMullen v. INS*, 788 F.2d 591, 595 (9th Cir. 1986) (quoting G. Goodwin-Gill, *The Refugee in International Law* 60–61 (1983)), *overruled on other grounds by Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) (en banc) (per curiam).   "In evaluating the political nature of a crime, we consider it important that the political aspect of the offense outweigh its common-law character.  This would not be the case if the crime is grossly out of proportion to the political objective or if it involves acts of an atrocious nature." *INS v. Aguirre-Aguirre*,

526 U.S. 415, 422 (1999) (quoting *In re McMullen*, 19 I. & N. Dec. 90, 97–98 (B.I.A. 1984)).

A large financial crime in the nature of theft, such as embezzlement, is normally a serious nonpolitical crime. *See Guo Qi Wang v. Holder*, 583 F.3d 86, 90 (2d Cir. 2009); *In re Ballester-Garcia*, 17 I. & N. Dec. 592, 595 (B.I.A. 1980) (finding nonviolent theft serious in part because "it involve[d] a very large sum of money"); *see also Kenyeres v. Ashcroft*, 538 U.S. 1301, 1302 (2003) (Kennedy, J., denying application for stay of removal) (classifying embezzlement as a serious nonpolitical crime). To rebut this presumption, the applicant must "identify . . . facts showing that his offense had some 'political aspect' or 'political objective.'" *Go*, 640 F.3d at 1052.

Guan argues that his crime was political in nature because the accusations against him are pretextual; the Chinese government's "true intent" in seeking his extradition is "to stifle his ability to further expose the degree and extent of corruption that Chinese government officials engaged in while involved with Jintailong." However, Guan conflates a politically motivated *prosecution* with a politically motivated *crime*.[4] He admitted that his

---

[4] In a related context, the Immigration and Naturalization Act provides that aliens are inadmissible if they committed a crime involving moral turpitude or have multiple criminal convictions, but excludes from these categories "purely political offenses." 8 U.S.C. § 1182(a)(2)(A)(i)(I), (a)(2)(B). The BIA applies this exception to nonpolitical crimes that were prosecuted for purely political reasons. *See* 22 C.F.R. §§ 40.21(a)(6), 40.22(d) (interpreting "purely political offense" to include "offenses that resulted in convictions obviously based on fabricated charges or predicated upon repressive measures against racial, religious, or political minorities"); *In re O'Cealleagh*, 23 I. & N. Dec. 976, 980 n.5 (B.I.A. 2006); *cf. In re B—*, 1 I. & N. Dec.

involvement in the Jintailong scheme stemmed from purely economic reasons: he had a lot of money on hand and "wanted to do some business." Therefore, he fails to rebut the presumption that his alleged crime was nonpolitical.

## 2. Probable Cause

Guan also argues that there is insufficient evidence to support the IJ's probable cause finding because he was unaware that the funds would not be repaid.[5] We disagree. Guan testified that "[t]he purpose of Mayor Yu's establishing [Jintailong]" was for public money to be embezzled, and Guan "knew [this] from the beginning." Moreover, Guan knew that Jintailong was an illegal enterprise because he was aware that the government officials backing it had used financial crime laws to put similar, rival schemes out of business when they became a competitive threat. Thus, substantial evidence supports the IJ's finding that there was probable cause to believe Guan

---

47, 50 (B.I.A. 1941) (finding that fraud conviction in Nazi Germany was not a crime of moral turpitude where the "conviction occurred primarily because of political considerations, to wit: the fact that the defendant was a Jew"). We need not decide whether this doctrine applies in the present context, however, because Guan fails to show that the charges against him are fabricated or that he was singled out for prosecution on account of his religious beliefs.

[5] It is unclear that the crime with which he is charged even has a knowledge element. Article 176 of the Chinese Criminal Law punishes "[w]hoever takes deposits from people illegally or in disguised form and disrupts financial order." Other crimes "Undermining the Order of Financial Management" explicitly require knowledge of the financial wrongdoing. *See, e.g.*, Chinese Criminal Law, art. 172 (punishing "[w]hoever knowingly possesses or uses a substantial amount of counterfeit money"). The absence of a knowledge element in article 176 suggests it could be satisfied by criminal negligence.

committed a serious nonpolitical crime, and Guan is statutorily ineligible for asylum or withholding of removal.

## B. Alleged Due Process Violations

The Due Process Clause of the Fifth Amendment guarantees that aliens in removal proceedings have "a full and fair opportunity to be represented by counsel, to prepare an application for . . . relief, and to present testimony and other evidence in support of [that] application." *Go*, 640 F.3d at 1055.

### 1. Guan's Fasting

Guan argues that he did not receive a full and fair hearing because his fasting impeded his ability to testify at the October 2016 hearing. While a significant amount of Guan's testimony was taken at that hearing, his testimony largely repeated information provided in his written statement. Moreover, nothing in the record suggests that Guan was impaired in any way. To the contrary, when questioned at the hearing about his fasting, Guan stated that he was "in a very good condition" and that the fasting "didn't affect" any of his answers. He explained that fasting "doesn't mean that we don't eat at all" and stated that he "want[ed] to finish the case" that day. The IJ continued the proceedings only out of an abundance of caution. There was no due process violation.

### 2. Interpreter Problems

Guan also argues that he did not receive a full and fair hearing because of problems communicating with the interpreter at the December 2016 hearing. However, very little testimony was taken prior to the continuance. And the testimony that was taken involved counsel for the

government asking "the same questions again" to elicit "the information [Guan] provided at the last hearing . . . so the record [would] be clear." Neither the IJ nor BIA cited testimony from that day in reaching their findings, and Guan does not explain how the problems with the interpreter affected his testimony or otherwise impacted the hearing's fairness. Therefore, he fails to show a due process violation.

### 3. Assistance of Counsel

Guan contends that his original counsel was ineffective for failing to object to the admission of the asylum officer's notes in the proceedings before the IJ. The right to be represented by counsel in an immigration proceeding at one's own expense "is protected as an incident of the right to a fair hearing under the Due Process Clause of the Fifth Amendment." *Gomez-Velazco v. Sessions*, 879 F.3d 989, 993 (9th Cir. 2018). Because Guan failed to comply with the procedural requirements for such a claim, *see In re Lozada*, 19 I. & N. Dec. 637, 639 (B.I.A. 1988),[6] he is entitled to relief only if "the ineffectiveness of counsel was plain on its face." *Tamang v. Holder*, 598 F.3d 1083, 1090 (9th Cir. 2010). A claim that counsel's ineffectiveness in immigration proceedings violated due process "requires a showing of inadequate performance and prejudice."

---

[6] These requirements are: "(1) the alien should submit an affidavit detailing the agreement with former counsel; (2) the alien must notify his former counsel of the allegations and afford counsel an opportunity to respond; and (3) 'the motion should reflect whether a complaint has been filed with appropriate disciplinary authorities regarding such representation, and if not, why not.'" *Correa-Rivera v. Holder*, 706 F.3d 1128, 1131 (9th Cir. 2013) (quoting *Lozada*, 19 I. & N. Dec. at 639); *see* 8 C.F.R. § 1208.4(a)(5)(iii)(A)–(C).

*Martinez-Hernandez v. Holder*, 778 F.3d 1086, 1088 (9th Cir. 2015).

The record does not show that counsel performed deficiently. Agency regulations specifically provide for the asylum officer's notes to be included in the record reviewed by the IJ, *see* 8 C.F.R. § 208.30(g)(2)(ii), and Guan does not argue that this regulation is invalid. Guan likewise fails to show prejudice. Neither the IJ nor the BIA based its decisions on the asylum officer's findings. Rather, their decisions were based primarily on Guan's subsequent testimony and written statement and the government's evidence. There is no reason to suspect that Guan's counsel's failure to object to the admission of the asylum officer's notes "may have affected the outcome of the proceedings." *Martinez-Hernandez*, 778 F.3d at 1088 (quoting *Maravilla Maravilla v. Ashcroft*, 381 F.3d 855, 858 (9th Cir. 2004)).

## C. Convention Against Torture

"To obtain relief under [the] CAT, a petitioner must prove that it is more likely than not that he or she will be tortured in the country of removal." *Parada*, 902 F.3d at 914; *see* 8 C.F.R. § 1208.16(c)(2). Guan claims that he is likely to be tortured in China "because of his knowledge and willingness to disclose information in the United States regarding the extent of corruption by Chinese government officials involved with Jintailong" and "due to his Christian beliefs and practices."

### 1. Torture in Connection with Guan's Disclosure of Alleged Corruption by Chinese Governmental Officials

Guan has not identified any actions that he took in the United States to expose the alleged corruption by Chinese government officials. Statements and testimony in connection with an asylum application are normally kept confidential. *See* 8 C.F.R. § 208.6. Nor has Guan presented any evidence that he is likely to be tortured on this ground. "Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty . . . ." 8 C.F.R. § 1208.18(a)(3). As Guan had the burden of proof, *see* 8 C.F.R. § 1208.16(c)(2), the IJ did not err in finding that Guan failed to meet it.

### 2. Torture in Connection with Guan's Religious Beliefs

Guan's claim of probable torture due to his religious beliefs and practices is more substantial. The BIA, in its conclusory affirmance of the IJ, apparently adopted the IJ's adverse credibility finding by citing to *Farah v. Ashcroft*, 348 F.3d 1153, 1156–57 (9th Cir. 2003). In *Farah*, we upheld the BIA's determination that the petitioner and his witnesses were not credible, and because the petitioner's CAT claims were based on the same statements with "no other evidence," we also upheld the denial of CAT relief. *Id.* at 1157.

*Farah* is distinguishable, however, because Guan offered additional evidence in support of his claim of religion-based torture that neither the BIA nor the IJ addressed. In particular, Guan presented country reports

indicating that Christians in China are subject to torture, and he presented a letter from a leader of his church in the United States stating that Guan began attending services there in 2014, shortly after he arrived in the United States. Thus, even if as a result of the adverse credibility finding the IJ properly rejected Guan's testimony that he participated in religious activities in China and was beaten up by the police for it, the unaddressed evidence still supports his CAT claim. It suggests that Guan is currently a practicing Christian and that such individuals face a risk of persecution in China, including torture.

In *Kamalthas v. INS*, we remanded a CAT claim when "the BIA failed to consider probative evidence in the record of country conditions which confirm that Tamil males [like the petitioner] have been subjected to widespread torture in Sri Lanka"—notwithstanding the agency's undisputed finding that the petitioner was not credible for asylum purposes. 251 F.3d 1279, 1284 (9th Cir. 2001). We were "not comfortable with allowing a negative credibility determination in the asylum context to wash over the torture claim; especially when the prior adverse credibility determination is not necessarily significant in this situation." *Id.*

We subsequently distinguished *Kamalthas* in a case where a Yemeni petitioner's CAT claim relied on "his discredited testimony and general reports indicating that torture occurs in Yemen." *Almaghzar v. Gonzales*, 457 F.3d 915, 922 (9th Cir. 2006). *Almaghzar* deferred to the BIA's determination that CAT relief was unavailable because "the reports alone" did not "compel the conclusion that [the petitioner] would be tortured if returned." *Id.* at 922–23. Here, in contrast, the country reports did not contain generalized statements that torture occurs in China. Rather,

they stated that members of particular religious groups, including Christians, are subject to torture. Moreover, Guan did not rely solely on the country reports and his discredited testimony; he also submitted proof from his U.S. church that he was a practicing Christian.

As in *Kamalthas*, the BIA's adverse credibility finding in the asylum context had little to do with the petitioner's claim for CAT relief. Guan's argument to the BIA for CAT relief, which he repeats here, focused mainly on his religious beliefs and practices and included only a conclusory statement that torture was also likely based on his Jintailong-related actions. The BIA's adverse credibility finding, which was based on an apparent inconsistency in Guan's testimony about his knowledge that the government officials were stealing from the general public, had nothing to do with his claim that he expects to be tortured based on his religious practices. Although an inconsistency serving as the basis for an adverse credibility finding "no longer need to 'go to the heart' of the petitioner's claim," *Shrestha v. Holder*, 590 F.3d 1034, 1043 (9th Cir. 2010) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)), it "should not be a mere trivial error," *id.* at 1044.

Even with respect to Guan's asylum and withholding claims, where his knowledge of wrongdoing at Jintailong was relevant, the adverse credibility finding was not particularly strong, being based on a single statement by Guan that the IJ may have misinterpreted.[7] In *Almaghzar*,

---

[7] Guan consistently testified that he knew Jintailong "did not have the qualifications to receive public deposits or loans," he "continued to work for [the government officials] knowing what they were doing was illegal," and he "knew from the beginning that [the officials] were going to steal money from the public." The IJ focused on Guan's purportedly

the adverse credibility evidence was much more substantial, *see* 457 F.3d at 918 ("Almaghzar . . . told two different tales . . . ."), so much so that the petitioner "[did] not argue that the IJ erred in determining that the stories were inconsistent to the point that they were not credible" or "that translation errors caused the inconsistencies," *id.* at 918 n.5. Guan, in contrast, forcefully disputes the adverse credibility finding.**[8]**

"It is well-accepted that country conditions alone can 'play a decisive role in granting relief under [CAT].'" *Nuru v. Gonzales*, 404 F.3d 1207, 1219 (9th Cir. 2005) (quoting *Kamalthas*, 251 F.3d at 1283). Because "the BIA abused its discretion when it failed to . . . show proper consideration of all factors when weighing equities and denying relief," *Kamalthas*, 251 F.3d at 1284 (alterations omitted) (quoting *Arrozal v. INS*, 159 F.3d 429, 432 (9th Cir. 1998)), we remand for reconsideration of Guan's CAT claim.

---

inconsistent statement that the money he collected for Jintailong was "all going to be returned." Guan may have meant that Jintailong's investors received a "return" on their investment in the form of regular interest payments. We need not reach the credibility issue, however, because the BIA's denial of Guan's asylum and withholding claims is supported by the independent ground that Guan committed a serious nonpolitical crime.

**[8]** *Almaghzar* did not remand for reconsideration of the CAT claim under *Ventura* and *Gonzales v. Thomas*, 547 U.S. 183 (2006) (per curiam), because the "IJ generally said that he had considered all evidence" and "the IJ and BIA decided the merits of [the] CAT claim with the benefit of the country condition reports." *Almaghzar*, 457 F.3d at 918 n.11. In contrast, here, the IJ did not make such a generalized statement in the decision regarding CAT relief. The BIA's decision cited *Farah*, where the BIA applied its adverse credibility finding from the asylum claim to the CAT claim "based on the same [discredited] statements" by the petitioner and "no other evidence," 348 F.3d at 1157, indicating that the BIA here also considered no other evidence.

## V. Conclusion

We deny Guan's petition for review as to his claims for asylum and withholding of removal. We grant the petition as to his claim for CAT relief and remand for the BIA to reconsider that claim in light of the country reports and the letter from Guan's U.S. church.

**PETITION GRANTED in part, DENIED in part, and REMANDED.**