NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JUN 15 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| LIBORIO DE LA LUZ RAMOS, AKA Mara De La Luz Ramos, <br><br>               Petitioner, <br><br> v. <br><br> MERRICK B. GARLAND, Attorney General, <br><br>               Respondent. | No.   17-73218 <br><br> Agency No. A206-498-269 <br><br> MEMORANDUM[*] |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted August 31, 2020
Pasadena, California

Before:  SILER,[**] BERZON, and LEE, Circuit Judges.

Valeria De La Luz Ramos petitions for review of the Board of Immigration

Appeals' ("the Board's") dismissal of her appeal of the Immigration Judge's

("IJ's") order denying her applications for asylum, withholding of removal, and

---

[*]      This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]     The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

protection under the Convention Against Torture.[1] We deny the petition in part, grant it in part, and remand for the agency to grant deferral of removal under the Convention Against Torture.

1.      The Board did not abuse its discretion in denying De La Luz Ramos's claims for asylum and withholding of removal on the grounds that her involuntary manslaughter conviction constituted a particularly serious crime. *See* 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). "The applicable legal standard to determine if a crime is particularly serious, described in the [Board]'s decision in *Matter of Frentescu*, 18 I. & N. Dec. 244 (BIA 1982), requires the agency to ask whether 'the nature of the conviction, the underlying facts and circumstances[,] and the sentence imposed justify the presumption that the convicted immigrant is a danger to the community.'" *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1077 (9th Cir. 2015) (quoting *Delgado v. Holder*, 648 F.3d 1095, 1107 (9th Cir. 2011) (en banc)).

The Board did not exceed the scope of its review by engaging in impermissible de novo factfinding. *See* 8 C.F.R. § 1003.1(d)(3)(i). First, the Board's determination that a three-year term of imprisonment is a "significant sentence" was not a factual finding. Rather, the BIA was assigning weight ("significant") to a fact (three-year sentence) as part of its discretionary analysis of

---

[1] De La Luz Ramos's birth name was Liborio, but she identifies as Valeria.

the *Frentescu* factors. The BIA was authorized to undertake that analysis. *See Delgado*, 648 F.3d at 1106–07.

Second, the Board's discussion of the elements of involuntary manslaughter and its citation to *Sea Horse Ranch, Inc. v. Superior Court*, 24 Cal. App. 4th 446, 454 (1994), was not factfinding. Consistent with the first *Frentescu* factor, the nature of the conviction, the BIA correctly identified the legal standard under which De La Luz Ramos was convicted. De La Luz Ramos was charged with and pleaded guilty to killing her friend in the "commission . . . of a noninherently dangerous felony," the practice of medicine without a license. *Sea Horse Ranch* involved the second clause of California's involuntary manslaughter statute, a killing "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." Cal. Penal Code § 192(b). That clause is the same one California courts apply to a killing in the commission of a noninherently dangerous felony. *See People v. Evers*, 10 Cal. App. 4th 588, 596 (1992) (citing *People v. Burroughs*, 35 Cal. 3d 824 (1984)).

The "noninherently dangerous felony [must be] committed without due caution and circumspection." *People v. Huynh*, 99 Cal. App. 4th 662, 679, *as modified on denial of reh'g* (July 15, 2002). "The words 'without due caution and circumspection' refer to criminal negligence—unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the

3

consequences." *Evers*, 10 Cal. App. 4th at 596. The Board's determination that De La Luz Ramos had "committed a criminally negligent act" therefore was not a finding of fact, nor did it indicate that the Board had failed to examine the underlying facts and circumstances of the conviction. De La Luz Ramos's conviction establishes as a matter of law that she was criminally negligent. Moreover, the Board did examine the facts and circumstances underlying the conviction and noted several "mitigating factors."

Finally, although De La Luz Ramos asserts that the "most important" *Frentescu* factor is "whether the type and circumstances of the crime indicate that the alien will be a danger to the community," *Frentescu*, 18 I. & N. Dec. at 247, "the [Board]'s 'approach to determining whether a crime is particularly serious has evolved' since *Matter of Frentescu*," and it is "no longer require[d] . . . to engage 'in a separate determination to address whether the alien is a danger to the community.'" *Anaya-Ortiz*, 594 F.3d 673, 679 (9th Cir. 2010) (quoting *Matter of N-A-M-*, 24 I. & N. Dec. 336, 342 (BIA 2007)). Instead, the Board considers "whether the nature of the conviction, the underlying facts and circumstances[,] and the sentence imposed justify the *presumption* that the convicted immigrant is a danger to the community." *Avendano-Hernandez*, 800 F.3d at 1077 (internal quotation marks omitted; emphasis added). Here, the Board "relied on the appropriate factors and proper evidence to reach" its conclusion that De La Luz

4

Ramos's conviction constituted a particularly serious crime. *Id.* (internal quotation marks and alteration omitted).

2.      An applicant for relief under the Convention Against Torture must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "The IJ and the [Board] do not appear to question that the assault[] and rape of [De La Luz Ramos] [rose] to the level of torture," *Avendano-Hernandez*, 800 F.3d at 1079, nor does the government dispute that conclusion.

The agency wrongly concluded, however, that De La Luz Ramos had not demonstrated that a public official had acquiesced in her torture. De La Luz Ramos credibly testified that she repeatedly sought help from the police but the police repeatedly refused to investigate. When doing so, police officers made dehumanizing comments about transgender people, such as "Oh, they're just those fags, they're not important. We're not going to go waste time with them." As the IJ found, when De La Luz Ramos reported her abduction and assault to the police, the police said, "It's not important," and did nothing. Although the Board referred to the officers' comments simply as "harassment," they were more than that: the comments expressed not only the officers' disapproval of De La Luz Ramos's gender identity but also their judgment that she did not deserve police assistance.

5

De La Luz Ramos also testified that the police never investigated the murders of her two transgender friends who had been extorted by the same gang.

Additionally, in considering whether the police acquiesced in De La Luz Ramos's torture, neither the Board nor the IJ mentioned a threatening phone call De La Luz Ramos received while waiting at the police station. She testified that the call was from a gang member, that only De La Luz Ramos's employee and the police knew her phone number, and that she therefore assumed the police gave the number to the gang. The Board and the IJ's failure to address De La Luz Ramos's testimony about the phone call was error. *See Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015) ("[The Convention Against Torture's] implementing regulations require the agency to consider 'all evidence relevant to the possibility of future torture.'" (quoting 8 C.F.R. § 1208.16(c)(3))).

Viewed as a whole, the record compels the conclusion that the Mexican government acquiesced in De La Luz Ramos's torture. *See Arrey v. Barr*, 916 F.3d 1149, 1161 (9th Cir. 2019).

The Board's conjecture that De La Luz Ramos was unlikely to be tortured in the future because she had "not established that anyone in Mexico, including members of the gang who seriously mistreated [her] in the past, are currently interested in [her] or asking about her whereabouts" is not supported by substantial evidence. De La Luz Ramos testified that she was afraid to return to Mexico

6

because she was afraid the gangs—not necessarily the same individuals—would kill her. And that fear was reasonable, as "past conduct frequently tells us much about how an individual or a government will behave in the future." *Nuru v. Gonzales*, 404 F.3d 1207, 1217 (9th Cir. 2005). That no gang members were asking about her whereabouts when they were not encountering her is no indication that they would not behave toward her as they had in the past when she was again in Mexico.

Considered alongside the evidence of De La Luz Ramos's past torture, the country conditions reports in the record compel the conclusion that she is likely to be tortured if returned. *See id.* at 1218–19. The U.S. State Department's 2016 Mexico Human Rights Report stated that authorities "often" failed to investigate hate crimes against lesbian, gay, bisexual, transgender, and intersex ("LGBTI") people, "including killings"; that transgender people in particular were marginalized; and that the "press reported three killings of transgender individuals in the space of 13 days." Another report in the record stated that "[m]ost hate crimes against the LGBT community go uninvestigated," and that 120 transgender people were murdered in the three years following Mexico's adoption in 2010 of a law allowing same-sex marriage, suggesting that new legal protections for LGBTI people had led to a backlash, particularly against transgender women.

Discounting this country conditions evidence, the Board cited *Almaghzar v.*

*Gonzales*, 457 F.3d 915, 922-23 (9th Cir. 2006), which held that reports confirming generally that "torture takes place in Yemen" did not "compel the conclusion that [petitioner] would be tortured if returned." But we have rejected reliance on *Almaghzar* where the reports in the record "did not contain generalized statements that torture occurs in China" but instead "stated that members of *particular* religious groups, including Christians, are subject to torture." *Guan v. Barr*, 925 F.3d 1022, 1034–35 (9th Cir. 2019) (emphasis added); *see also Muradin v. Gonzales*, 494 F.3d 1208, 1211 (9th Cir. 2007); *Hosseini v. Gonzales*, 471 F.3d 953, 960 (9th Cir. 2006); *Nuru*, 404 F.3d at 1219. Here, the country conditions evidence in the record indicates that transgender women *specifically* are frequent targets of violence, including murder, in Mexico and that crimes against them are unlikely to be investigated. As we have recognized, "Mexico suffers from an epidemic of unsolved violent crimes *against transgender persons*," and has "one of the highest documented number[s] of transgender murders in the world." *Avendano-Hernandez*, 800 F.3d at 1081 (emphasis added).

We grant the petition in part and remand for the Board to grant deferral of removal under the Convention Against Torture.

**PETITION DENIED IN PART, GRANTED IN PART, AND REMANDED.**