**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EDIN CAREY AVENDANO-HERNANDEZ, | No. 13-73744 |
| *Petitioner*, | Agency No. A099-823-350 |
| v. | |
| LORETTA E. LYNCH, Attorney General, | OPINION |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
March 6, 2015—Pasadena, California

Filed September 3, 2015

Before: Harry Pregerson, Barrington D. Parker, Jr.,[*] and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen

---

[*] The Honorable Barrington D. Parker, Jr., United States Circuit
Judge for the Second Circuit, sitting by designation.

## SUMMARY[**]

### Immigration

The panel denied a petition for review as to the Board of Immigration Appeals' denial of withholding of removal and granted the petition as to the Board's denial of deferral of removal under the Convention Against Torture.

The panel held that the Board was within its discretion in denying withholding of removal based on its determination that Avendano-Hernandez's conviction for driving while having a .08 percent or higher blood alcohol level and causing bodily injury to another person, in violation of California Vehicle Code § 23153(b), was a particularly serious crime. The panel explained that the Board properly characterized the facts and circumstances surrounding the crime, and that this court lacks jurisdiction to reweigh the evidence the Board considered in determining on a case-by-case basis that the offense constituted a PSC.

The panel held that the Board erred in denying Avendano-Hernandez's application for CAT relief because it failed to recognize the difference between gender identity and sexual orientation. The panel held that the Board also erred in assuming that recent anti-discrimination laws in

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Mexico have made life safer for transgender individuals, while ignoring significant record evidence of violence targeting them. The panel remanded for a grant of CAT relief in light of Avendano-Hernandez's past torture and unrebutted country conditions evidence showing a clear probability of future torture with government acquiescence.

**COUNSEL**

Andrea Ruth Bird (argued) and Matthew Williamson, Manatt, Phelps & Phillips, LLP, Costa Mesa, California; and Munmeeth K. Soni, Public Law Center, Santa Ana, California, for Petitioner.

Corey L. Farrell (argued), Stuart F. Delery, Assistant Attorney General, and Terri J. Scadron, Assistant Director, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for Respondent.

Nancy M. Olson, Gibson, Dunn & Crutcher LLP, Irvine, California, for Amici Curiae National Immigrant Justice Center, East Bay Community Law Center, The Florence Project, Immigration Equality, Lawyers' Committee for Civil Rights, and The National Center for Lesbian Rights.

**OPINION**

NGUYEN, Circuit Judge:

Edin Avendano-Hernandez is a transgender woman who grew up in a rural town in Oaxaca, Mexico. Born biologically male, she knew from an early age that she was different. Her appearance and behavior were very

feminine, and she liked to wear makeup, dress in her sister's clothes, and play with her sister and female cousins rather than boys her age. Because of her gender identity and perceived sexual orientation, as a child she suffered years of relentless abuse that included beatings, sexual assaults, and rape. The harassment and abuse continued into adulthood, and, eventually, she was raped and sexually assaulted by members of the Mexican police and military. She ultimately sought refuge in the United States, applying for withholding of removal and relief under Article 3 of the Convention Against Torture ("CAT").

Avendano-Hernandez has a prior 2006 felony conviction for driving while having a .08 percent or higher blood alcohol level and causing bodily injury to another person, a violation of California Vehicle Code § 23153(b). The Board of Immigration Appeals ("BIA") concluded that this conviction constitutes a particularly serious crime, rendering Avendano-Hernandez ineligible for withholding of removal. We find that the BIA's decision was within its discretion. The immigration judge ("IJ") and the BIA erred, however, in denying her application for CAT relief, ironically exhibiting some of the same misconceptions about the transgender community that Avendano-Hernandez faced in her home country. The IJ failed to recognize the difference between gender identity and sexual orientation, refusing to allow the use of female pronouns because she considered Avendano-Hernandez to be "still male," even though Avendano-Hernandez dresses as a woman, takes female hormones, and has identified as woman for over a decade. Although the BIA correctly used female pronouns for Avendano-Hernandez, it wrongly adopted the IJ's analysis, which conflated transgender identity and sexual orientation. The BIA also erred in assuming that recent anti-discrimination laws in Mexico have made life safer for transgender individuals while

ignoring significant record evidence of violence targeting them.  We grant the petition in part and remand for a grant of relief under CAT.

## BACKGROUND

Avendano-Hernandez, a native and citizen of Mexico, is a transgender woman.  She knew from as young as five or six that she was different—she was feminine and loved to wear makeup and dress in her sister's clothes, and preferred the company of girls rather than boys of her age.[1] As a result, she was frequently targeted for harassment and abuse.  Her father brutally beat her and called her "faggot" and "queer," and her schoolmates tormented her in class and physically assaulted her for being "gay."  Soon, Avendano-Hernandez's older brothers and cousins began sexually abusing her.  They forced her to perform oral sex, raped her, and beat her when she tried to resist their attacks. Her parents had reason to suspect this abuse was occurring, but did not intervene.  When Avendano-Hernandez told her mother that her stomach hurt and she bled when using the restroom, her mother merely gave her herbal remedies to help alleviate her pain.  Similarly, her father beat her for being a "faggot" after he saw a hickey left on her chest by her brother while he raped her.  She was also harassed by a male teacher, who told her he knew she was gay, touched

---

[1] The IJ found Avendano-Hernandez to be credible, and the BIA affirmed this finding.  Thus, "we accept the facts given by [the petitioner] and all reasonable inferences to be drawn from them as true."  *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1054 n.2 (9th Cir. 2006).

her inappropriately, and attempted to force her to perform oral sex.

The abuse continued as Avendano-Hernandez got older. In junior high school, her classmates would write "Edin is gay and likes men" on the blackboard or on notes they would stick to her back. People in her town, including members of the police and the military, would also call her "gay" when seeing her in public. At the age of 16, Avendano-Hernandez dropped out of high school and moved to Mexico City, where she worked at a nightclub. The club's customers also harassed her because of her feminine appearance and behavior, called her derogatory names, and, on one occasion, physically attacked her. She lived in constant fear.

A year later, Avendano-Hernandez returned to her hometown to care for her mother, who was battling cancer. One of her older brothers, who had raped her when she was a child, was also living in their parents' home and threatened to kill her if she did not leave the community. Shortly after her mother's death, in July 2000, Avendano-Hernandez unlawfully entered the United States and settled in Fresno, California. She began taking female hormones in 2005, and lived openly as a woman for the first time.

In the United States, Avendano-Hernandez struggled with alcohol abuse, and was twice convicted of driving under the influence of alcohol. Her first offense, committed on March 6, 2006, resulted in a misdemeanor conviction. Her second offense, committed several months later on July 4, involved a head-on collision with another vehicle, causing injuries to both Avendano-Hernandez and the driver of the other car. This second offense led to a felony conviction on September 27, 2006 for driving while having a .08 percent or higher blood alcohol level and

causing injury to another, a violation of California Vehicle Code § 23153(b). She was sentenced to 364 days incarceration and three years of probation. After her release from custody, she was removed to Mexico in March 2007 under a stipulated order of removal.

Back in Mexico, Avendano-Hernandez again faced harassment from her family and members of the local community because of her gender identity and perceived sexual orientation. One evening, when Avendano-Hernandez was on her way to visit family in Oaxaca's capital city, armed uniformed police officers stationed at a roadside checkpoint hurled insults at her as she walked past them. Four officers then followed her down a dirt road, grabbed her, forced her into the bed of their truck, and drove her to an unknown location. Shouting homophobic slurs, they beat her, forced her to perform oral sex, and raped her. One officer hit her in the mouth with the butt of his rifle, and another held a knife to her chin, cutting her hand when she tried to push it away. After the assault, the officers told her that they knew where she lived and would hurt her family if she told anyone about the attack.

This assault prompted Avendano-Hernandez to flee Mexico almost immediately. While attempting to cross the border with a group of migrants a few days later, Avendano-Hernandez encountered a group of uniformed Mexican military officers. Though the leaders of the migrant group had asked Avendano-Hernandez to dress differently to avoid attracting attention at the border, she was still visibly transgender, as she wore her hair in a ponytail and had been taking female hormones for several years. Calling her a "faggot," the officers separated Avendano-Hernandez from the rest of her group. One of the officers forced her to perform oral sex on him, while the rest of the group watched and laughed. The officer then

told her to "get out of his sight."  She successfully reentered the United States in May 2008 and returned to Fresno.  Three years later, she was arrested for violating the terms of probation imposed in her 2006 felony offense for failing to report to her probation officer.

Placed in removal proceedings and fearful of returning to Mexico, Avendano-Hernandez applied for withholding of removal and CAT relief.  The IJ denied her application for withholding of removal on the ground that Avendano-Hernandez's 2006 felony conviction constitutes a "particularly serious crime," barring her eligibility.  *See* 8 U.S.C. § 1231(b)(3)(B)(ii).  The BIA, conducting de novo review, reached the same conclusion.  As to Avendano-Hernandez's CAT claim, the BIA denied relief on the ground that she failed to "demonstrate[] that a member of the Mexican government acting in an official capacity will more likely than not 'consent' to or 'acquiesce' in her torture; that is, come to have advance knowledge of any plan to torture or kill her and thereafter breach her legal responsibility to intervene to prevent such activity."  *Matter of Avendano-Hernandez*, File No. A099823350, at 3 (BIA Oct. 15, 2013).  This timely petition for review followed.

## DISCUSSION

### I.

### *Withholding of Removal*

Avendano-Hernandez argues that the IJ and the BIA erred in finding her ineligible for withholding of removal on the ground that her felony conviction constitutes a particularly serious crime.

An alien is ineligible for withholding of removal if "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of

the United States."   8 U.S.C. § 1231(b)(3)(B)(ii).   An aggravated felony resulting in an aggregate sentence of five years imprisonment is a per se particularly serious crime. *Id.*   § 1231(b)(3)(B).      However, because the term "particularly serious crime" is not otherwise defined by statute, the Attorney General may also "designate offenses as particularly serious crimes through case-by-case adjudication as well as regulation." *Delgado v. Holder*, 648 F.3d 1095, 1098 (9th Cir. 2011) (en banc).   The applicable legal standard to determine if a crime is particularly serious, described in the BIA's decision in *Matter of Frentescu*, 18 I. & N. Dec. 244 (BIA 1982), requires the agency to ask whether "the nature of the conviction, the underlying facts and circumstances and the sentence imposed justify the presumption that the convicted immigrant is a danger to the community."   *Delgado*, 648 F.3d at 1107.

We have jurisdiction to review for abuse of discretion the BIA's conclusion that an offense constitutes a particularly serious crime. *Arbid v. Holder*, 700 F.3d 379, 382, 384–85 (9th Cir. 2012).   Our review is limited to ensuring that the agency relied on the "appropriate factors" and "[]proper evidence" to reach this conclusion. *Anaya-Ortiz v. Holder*, 594 F.3d 673, 676 (9th Cir. 2010) (internal citations omitted); *see also Afridi v. Gonzales*, 442 F.3d 1212, 1218 (9th Cir. 2006), *overruled in part on other grounds by Estrada-Espinoza v. Mukasey*, 546 F.3d 1147, 1160 n.15 (9th Cir. 2008) (en banc).   We may not reweigh the evidence and reach our own determination about the crime's seriousness. *See Konou v. Holder*, 750 F.3d 1120, 1127 (9th Cir. 2014).

Here, the agency applied the proper legal standard in concluding that Avendano-Hernandez's conviction is a particularly serious crime.   While "driving under the

influence is not statutorily defined as an aggravated felony," *Delgado*, 648 F.3d at 1097, the BIA may determine that this offense constitutes a particularly serious crime on a case-by-case basis.  *See, e.g.*, *Anaya-Ortiz*, 594 F.3d at 679–80 (concluding that this court has no jurisdiction to reweigh the BIA's determination that a felony DUI causing injury conviction under California law constitutes a particularly serious crime); *cf. Delgado*, 648 F.3d at 1107–08 (remanding to the BIA to clarify how it concluded that the petitioner's driving while under the influence offense constituted a particularly serious crime). The agency in this case appropriately found Avendano-Hernandez's offense to be an "inherently dangerous activity, [as it] has the potential for great harm to the driver and all others encountered."

Contrary to Avendano-Hernandez's claim, the BIA did not mischaracterize the facts and circumstances surrounding the crime.  Avendano-Hernandez argues that her accident caused less severe injuries to the other driver than those inflicted by the *Anaya-Ortiz* petitioner: the police report indicates that Avendano-Hernandez caused the other driver to suffer neck and back pain, as well as minor pain to the right arm and left knee, while in *Anaya-Ortiz*, the petitioner crashed into a house, causing the walls to fall down on its elderly inhabitant, 594 F.3d at 675.  The BIA addressed these factual distinctions, and found them insufficient to "minimize the applicant's offense or reduce her culpability."  We cannot overturn this conclusion without reweighing the *Frentescu* factors, which we lack jurisdiction to do. *See Konou*, 750 F.3d at 1127.

We agree with Avendano-Hernandez that the IJ erred in treating her two-year sentence for violating probation as an "enhancement" of her original sentence.  *Frentescu* allows consideration of "the type of sentence imposed" for the

offense, 18 I. & N. Dec. at 247, which in this case was three years of probation and 364 days incarceration. While we have upheld the consideration of sentence enhancements in the particularly serious crime analysis, *see Konou*, 750 F.3d at 1128, a sentence imposed for violating probation is not a sentence enhancement. However, the IJ's error was harmless. The BIA properly identified Avendano-Hernandez's sentence as 364 days incarceration, and "[w]here the BIA conducts a de novo review, '[a]ny error committed by the IJ will be rendered harmless by the Board's application of the correct legal standard.'" *Brezilien v. Holder*, 569 F.3d 403, 411 (9th Cir. 2009) (second alteration in original) (quoting *Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir. 1995)). Because the BIA properly found that Avendano-Hernandez's prior felony conviction constitutes a particularly serious crime, she is ineligible for withholding of removal.

## II.

### *Convention Against Torture*

We now turn to Avendano-Hernandez's claim for relief under CAT. "We have jurisdiction pursuant to § 1252(a) to review the BIA's denial of [petitioner]'s claim for CAT deferral," *Delgado*, 648 F.3d at 1108, and review the factual findings behind the agency's conclusion for substantial evidence, *Zheng v. Ashcroft*, 332 F.3d 1186, 1193 (9th Cir. 2003). The BIA concluded that Avendano-Hernandez failed to show that the Mexican government will more likely than not consent to or acquiesce in her torture. This conclusion is not supported by the record.

## A. Avendano-Hernandez's Rape and Sexual Assault by Mexican Officials Constitute Past Torture

To receive deferral of removal under CAT, Avendano-Hernandez must show that upon her return to Mexico "she is more likely than not to be tortured," 8 C.F.R. § 1208.17(a), either "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," *id.* § 1208.18(a)(1). Torture is defined, in part, as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . for any reason based on discrimination of any kind." *Id.* When evaluating an application for CAT relief, the IJ and the BIA should consider "all evidence relevant to the possibility of future torture, including . . . [e]vidence of past torture inflicted upon the applicant." *Id.* § 1208.16(c)(3).

The IJ and the BIA do not appear to question that the assaults and rape of Avendano-Hernandez rise to the level of torture. Avendano-Hernandez was raped, forced to perform oral sex, beaten severely, and threatened. "Rape can constitute torture . . . [as it] is a form of aggression constituting an egregious violation of humanity." *Zubeda v. Ashcroft*, 333 F.3d 463, 472 (3d Cir. 2003). *See also Edu v. Holder*, 624 F.3d 1137, 1147 (9th Cir. 2010) (remanding for the BIA to grant CAT relief to a petitioner who had been raped); *cf. Lopez-Galarza v. I.N.S.*, 99 F.3d 954, 959 (9th Cir. 1996) (holding that rape and sexual assault may constitute persecution for asylum purposes). Moreover, Avendano-Hernandez was singled out because of her transgender identity and her presumed sexual orientation. *See* 8 C.F.R. § 1208.18(a)(1) (defining torture, in part, as "any act by which severe pain or suffering . . . is intentionally inflicted on a person . . . for any reason based on discrimination of any kind"). "[T]he officer[s]' words

during the assaults make clear that [they were] motivated by [petitioner]'s sexuality." *Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1089 (9th Cir. 2005). Rape and sexual abuse due to a person's gender identity or sexual orientation, whether perceived or actual, certainly rises to the level of torture for CAT purposes. *Cf. Hernandez-Montiel v. INS*, 225 F.3d 1084, 1097 (9th Cir. 2000) (finding that sexual assaults perpetrated against a transgender woman "undoubtedly constitute persecution"), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177, 1187 (9th Cir. 2005).

The agency, however, wrongly concluded that no evidence showed "that any Mexican public official has consented to or acquiesced in prior acts of torture committed against homosexuals or members of the transgender community." In fact, Avendano-Hernandez was tortured "by . . . public official[s]"—an alternative way of showing government involvement in a CAT applicant's torture. 8 C.F.R. § 1208.18(a)(1). Avendano-Hernandez provided credible testimony that she was severely assaulted by Mexican officials on two separate occasions: first, by uniformed, on-duty police officers, who are the "prototypical state actor[s] for asylum purposes," *Boer-Sedano*, 418 F.3d at 1088, and second, by uniformed, on-duty members of the military. Such police and military officers are "public officials" for the purposes of CAT. *See also Muradin v. Gonzales*, 494 F.3d 1208, 1210–11 (9th Cir. 2007) (recognizing that abuse by military officers can constitute government torture in the CAT context). The BIA erred by requiring Avendano-Hernandez to also show the "acquiescence" of the government when her torture was

inflicted *by* public officials themselves, as a plain reading of the regulation demonstrates.**[2]**  8 C.F.R. § 1208.18(a)(1) (specifying that the act must be inflicted "by *or* at the instigation of *or* with the consent or acquiescence of a public official") (emphasis added).  *See also Baballah v. Ashcroft*, 367 F.3d 1067, 1078 (9th Cir. 2003) (finding "governmental involvement" to be "conclusively establish[ed] where "there is no question that the perpetrators of the persecution were themselves government actors").

We reject the government's attempts to characterize these police and military officers as merely rogue or corrupt officials.  The record makes clear that both groups of officers encountered, and then assaulted, Avendano-Hernandez while on the job and in uniform.  Avendano-Hernandez was not required to show acquiescence by a higher level member of the Mexican government because "an applicant for CAT relief need not show that the entire foreign government would consent to or acquiesce in [her] torture."  *Madrigal v. Holder*, 716 F.3d 499, 509 (9th Cir. 2013).  It is enough for her to show that she was subject to torture at the hands of local officials.  Thus, the BIA erred by finding that Avendano-Hernandez was not subject to past torture by public officials in Mexico.

---

**[2]**  Alternatively, Avendano-Hernandez proved government acquiescence because several police and military officers stood by and watched their colleagues assault her.  This assuredly constitutes "awareness of" her torture and "breach [of their] legal responsibility to intervene to prevent such activity."  8 C.F.R. §1208.18(a)(7).

## B. The Record Evidence Compels a Finding of Likely Future Torture

"[P]ast torture is ordinarily the principal factor on which we rely when an applicant who has been previously tortured seeks relief under the Convention" because, absent changed circumstances, "if an individual has been tortured and has escaped to another country, it is likely that he will be tortured again if returned to the site of his prior suffering." *See Nuru v. Gonzales*, 404 F.3d 1207, 1217–18 (9th Cir. 2005).  In addition, the agency must evaluate all other evidence relevant to the claim, including proof of "gross, flagrant, or mass violations of human rights" in the home country and other country conditions evidence.  *Id.* at 1218–19.

The BIA's conclusion that Avendano-Hernandez failed to show a likelihood of future torture is not supported by substantial evidence.  The BIA primarily relied on Mexico's passage of laws purporting to protect the gay and lesbian community.  The agency's analysis, however, is fundamentally flawed because it mistakenly assumed that these laws would also benefit Avendano-Hernandez, who faces unique challenges as a transgender woman.[3]  There is no dispute that Mexico has extended some legal protections

---

[3] While the record does mention two laws meant to protect the transgender community—a 2004 amendment to the Mexico City Civil Code allowing transgender people to change their registered name and sex on their birth certificates, and a national anti-discrimination law that includes protections for gender expression—neither the IJ nor the BIA appear to have specifically considered these protections or their effectiveness.

to gay and lesbian persons; for example, Mexico City legalized gay marriage and adoption in December 2009, and the Mexican Supreme Court has held that such marriages must be recognized by other Mexican states. U.S. Dep't of State, *Country Reports on Human Rights Practices for 2011,* ECF No. 6-1 at 530. But laws recognizing same-sex marriage may do little to protect a transgender woman like Avendano-Hernandez from discrimination, police harassment, and violent attacks in daily life.

While the relationship between gender identity and sexual orientation is complex, and sometimes overlapping, the two identities are distinct. Avendano-Hernandez attempted to explain this to the IJ herself, clarifying that she used to think she was a "gay boy" but now considers herself to be a woman. Of course, transgender women and men may be subject to harassment precisely because of their association with homosexuality. *See, e.g.*, *Hernandez-Montiel*, 225 F.3d at 1094 (surmising that "gay men with female sexual identities" may be singled out for persecution because of their presumed role in gay relationships); *cf. Latta v. Otter*, 771 F.3d 456, 495 (9th Cir. 2014) (Berzon, J., concurring) ("[T]he social exclusion and state discrimination against lesbian, gay, bisexual, and transgender people reflects, in large part, disapproval of their nonconformity with gender-based expectations.") (footnote omitted). Avendano-Hernandez's own experiences in Mexico reflect this reality, as her persecutors have often labeled her as "gay" and called her a number of homophobic slurs that are also used against gay men.

Yet significant evidence suggests that transgender persons are often especially visible, and vulnerable, to harassment and persecution due to their often public

nonconformance with normative gender roles.[4]   Country conditions evidence shows that police specifically target the transgender community for extortion and sexual favors, and that Mexico suffers from an epidemic of unsolved violent crimes against transgender persons.   Indeed, Mexico has one of the highest documented number of transgender murders in the world.   Avendano-Hernandez, who takes female hormones and dresses as a woman, is therefore a conspicuous target for harassment and abuse. She was immediately singled out for rape and sexual assault by police and military officers upon first sight, and despite taking pains to avoid attracting violence when she attempted to cross the border, she was still targeted. Avendano-Hernandez's    experiences    reflect    how transgender persons are caught in the crosshairs of both generalized homophobia and transgender-specific violence and discrimination.

The BIA acknowledged record evidence regarding corruption among the Mexican police and military, but concluded that such evidence was unrelated to Avendano-Hernandez's fears of torture as a transgender woman because the corruption only occurred in the context of drug

---

[4] The Department of Homeland Security recently acknowledged the vulnerabilities of transgender persons, as Immigration and Customs Enforcement issued detailed guidance to its officers and employees regarding steps to assure the safety and proper care of transgender individuals held in immigration detention.  Thomas Homan, Executive Associate Director, U.S. Immigration and Customs Enforcement, *Further Guidance Regarding the Care of Transgender Detainees*, June 19,    2015,    *available    at*    https://www.ice.gov/sites/default/files/ documents/Document/2015/TransgenderCareMemorandum.pdf.

trafficking and accepting bribes. Again, this conclusion misreads the record. The evidence before the agency does not focus on drug trafficking-related police corruption, but instead shows an *increase* in violence against gay, lesbian, and transgender individuals during the years in which greater legal protections have been extended to these communities. *See Vitug v. Holder*, 723 F.3d 1056, 1066 (9th Cir. 2013) (noting that the emergence of gay rights activism in the Philippines and an ordinance protecting gays and lesbians from employment discrimination "do[] not indicate that there is any less violence against gay men or that police have become more responsive to reports of antigay hate crimes"). Avendano-Hernandez's expert explained that the passage of these laws has made the "situation . . . paradoxically become increasingly more perilous [for the gay, lesbian, and transgender community], as the public and authorities react to their expressions of a form of sexuality that the culture does not embrace and, in fact, fears." Declaration of Dr. Nielan Barnes, Mar. 5, 2013, ECF No. 6-1 at 412. Indeed, the country's highest number of hate crimes in 2010 took place in Mexico City— where arguably the *most* efforts have been made to protect the rights of sexual minorities—and there is a continued failure to prosecute the perpetrators of homophobic hate crimes throughout Mexico. The agency's focus on drug-related police corruption is inexplicable in light of the overwhelming record evidence of ineffective police protection of transgender persons.[5]

---

[5] Thus, this case is distinguishable from *Madrigal v. Holder*, where the agency's failure to consider the effectiveness of the Mexican government's "willingness to control Los Zetas" required remand for

On this record, we find that Avendano-Hernandez is entitled to a grant of CAT relief on remand. "[U]nder the ordinary remand rule, 'we are not permitted to decide a claim that the immigration court has not considered in the first instance.'" *Coronado v. Holder*, 759 F.3d 977, 987 (9th Cir. 2014) (quoting *Montes-Lopez v. Gonzales*, 486 F.3d 1163, 1165 (9th Cir. 2007)). But here, the BIA has already fully considered Avendano-Hernandez's CAT claim. The agency's conflation of transgender and gay identity does not constitute the application of "an erroneous legal standard" that would normally require us to remand the case for further consideration. *Lopez v. Ashcroft*, 366 F.3d 799, 806–807 (9th Cir. 2004). Instead, the agency's denial is based on its factual confusion as to what constitutes transgender identity and its erroneous conclusion that "[t]here is no substantial evidence in the record . . . to show that any Mexican public official has consented to or acquiesced in prior acts of torture committed against . . . members of the transgender community." In light of Avendano-Hernandez's past torture, and unrebutted country conditions evidence showing that such violence continues to plague transgender women in Mexico, "no questions remain—she was tortured and there is a substantial danger that she will be, if returned." *Edu*, 624 F.3d at 1147. We grant Avendano-

---

consideration of the question in the first instance. 716 F.3d 499, 507 (9th Cir. 2013). Here, in contrast, the agency appears to have considered the question of whether police protections are effective, but its conclusion that they are only ineffective in the context of collaboration with drug traffickers is not supported by substantial evidence.

Hernandez's petition in part and remand her case for a grant of CAT relief.

## CONCLUSION

The unique identities and vulnerabilities of transgender individuals must be considered in evaluating a transgender applicant's asylum, withholding of removal, or CAT claim. Here, the BIA properly found Avendano-Hernandez ineligible for withholding of removal because of her conviction for a particularly serious crime. We thus deny the petition in part as to her withholding of removal claim. We grant the petition in part and remand for the agency to grant CAT deferral relief because the record compels the conclusion that she will likely face torture if removed to Mexico.

**PETITION DENIED IN PART, GRANTED IN PART, AND REMANDED.**

Each party shall bear its own costs on appeal.