NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

AUG 11 2025

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

EDWIN ARTIGA-MORALES,

Petitioner,

v.

PAMELA BONDI, Attorney General,

Respondent.

No. 24-2519

Agency No.
A042-482-958

MEMORANDUM*

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 4, 2025
Las Vegas, Nevada

Before: RAWLINSON, MILLER, and DESAI, Circuit Judges
Dissent by Judge DESAI.

Petitioner Edwin Artiga-Morales (Artiga-Morales), a native and citizen of El

Salvador, petitions for review of a decision from the Board of Immigration

Appeals (BIA), dismissing his appeal of the denial by an Immigration Judge of his

application for deferral of removal under the Convention Against Torture (CAT).

We have jurisdiction under 8 U.S.C. § 1252, and we deny the petition.

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

"Our review is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted. . . ." *Singh v. Garland*, 57 F.4th 643, 651 (9th Cir. 2023), *as amended* (citation omitted). Factual findings are reviewed for substantial evidence and questions of law are reviewed de novo. *See id.*

The denial of CAT relief was supported by substantial evidence. For relief under the CAT, Artiga-Morales was required to establish that "it is more likely than not that he will be tortured if removed" to El Salvador. *Id.* at 658. Any torture would have to be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). Torture is "an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." *Hernandez v. Garland*, 52 F.4th 757, 769 (9th Cir. 2022) (citation omitted).

Artiga-Morales fears that because of his tattoos, deportee status, familial ties to Salvadoran prisons, criminal history and previous gang affiliation, he is at a particularized risk of torture under the current State of Exception policy in El Salvador. To substantiate his fear, Artiga-Morales relies on country conditions evidence. That evidence establishes that the Salvadoran government is targeting individuals, like Artiga-Morales, who have visible gang affiliations. The evidence also establishes that there have been instances of torture in Salvadoran prisons

under the State of Exception. But the evidence does not establish that the majority of individuals detained under the State of Exception are tortured, nor that Artiga-Morales is subject to a higher risk of torture in prison than any other individual with a gang connection.[1] Artiga-Morales argues that the IJ erred by failing to consider the aggregate risk of torture from six sources in El Salvador: immigration officials, police, detention officers, gang members, "death squads," and community members. But Artiga-Morales concedes that, before the IJ, he expressed a fear of harm solely from detention in El Salvador. Therefore, his argument based on other potential sources of torture is unexhausted, and the BIA did not err by failing to consider it. *See Umana-Escobar v. Garland*, 69 F.4th 544, 550 (9th Cir. 2023).

**PETITION DENIED.**[2]

---

[1] Our colleague in dissent focuses on the generalized evidence of appalling conditions in Salvadoran prisons, *see Dissent*, pp. 3-5. But as explained, that evidence falls short of demonstrating that the majority of detainees in El Salvador are tortured. Therefore, Artiga-Morales must show that he faces a higher risk of torture than the average detainee in El Salvador. Because he cannot make that showing, he is not entitled to CAT relief.

[2] The stay of removal will remain in place until the mandate issues. The motion for stay of removal (Dkt. #2) is otherwise denied.

*Artiga-Morales v. Bondi*, No. 24-2519

DESAI, Circuit Judge, dissenting:

The majority applies the wrong legal standard to conclude that petitioner is not eligible for CAT relief. Despite acknowledging that Artiga-Morales is at a particularized risk of detention if returned to El Salvador, the majority ignores substantial (and largely uncontested) evidence of the violence and inhumane conditions that he will face once detained. Maj. at 2. Because the evidence compels the conclusion that Artiga-Morales will more likely than not be tortured if removed to El Salvador, I would grant his petition. I thus respectfully dissent.

The majority holds that Artiga-Morales is not entitled to relief because "the evidence does not establish that the majority of individuals detained under the State of Exception are tortured, nor that Artiga-Morales is subject to a higher risk of torture in prison than any other individual with a gang connection." Maj. at 3. But that is not the test to qualify for CAT relief. Petitioner need not show that most people will be tortured or that he faces a higher risk of torture than other former gang members. He need only show that *he* will "more likely than not" be tortured "by or at the instigation of or with the consent or acquiescence of a public official" if removed to El Salvador. *See Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1079 (9th Cir. 2015) (quoting 8 C.F.R. §§ 1208.17(a), 1208.18(a)(1)). Because the majority acknowledges that Artiga-Morales faces a particularized risk of detention and that

1

the Salvadorean government is specifically targeting deported individuals like him, with visible gang-related tattoos and prior gang affiliations, Maj. at 2, we must grant relief if there is substantial evidence that torture at the hands of the Salvadorean government is more likely than not.[1]

Artiga-Morales presents compelling country conditions evidence, through expert Dr. Patrick J. McNamara, that he will more likely than not be tortured in prison by Salvadorean officials as a form of punishment. *See Kamalthas v. INS*, 251 F.3d 1279, 1280, 1283 (9th Cir. 2001) ("[C]ountry conditions alone can play a decisive role in granting relief under the Convention."); *Castillo v. Barr*, 980 F.3d 1278, 1284 (9th Cir. 2020) (holding that expert testimony by itself can support a petitioner's CAT claim). According to Dr. McNamara, prison conditions in El Salvador are designed "to inflict physical and psychological pain on inmates as a form of punishment that goes beyond the deprivation of liberty." *See Lopez v. Sessions*, 901 F.3d 1071, 1078 (9th Cir. 2018) ("Torture is defined as an extreme

---

[1] The majority appropriately concludes that petitioner faces a particularized risk of detention because, under the current State of Exception and Decree 717, Artiga-Morales will almost certainly be detained in El Salvador. The State of Exception is an emergency decree that has been in place since March 27, 2022, which suspends constitutional rights and permits the Salvadorean government to use extreme measures to eradicate gangs and gang activities in the country. Decree 717 grants the Salvadorean National Civilian Police "broad powers to monitor, question, and detain persons suspected of any criminal history."

form of cruel and inhuman treatment that is specifically intended to inflict severe physical or mental pain or suffering." (quotation omitted)).

In 2023, officials reported that at least 400 detainees had died in Salvadorean prisons due to unsanitary conditions, life-threatening illnesses that had gone untreated due to denial of medical care, and beatings. Prison officials often do not notify family members of the deaths of their loved ones. Due to chronic underreporting, it is difficult to say how many prisoners die while in custody. But experts believe that "far more" than 400 people have died while in detention and that the number of detainee deaths has "increased 300 percent during the state of emergency." *See Bromfield v. Mukasey*, 543 F.3d 1071, 1079 (9th Cir. 2008) (explaining that beatings and killings constitute torture).

Apart from these tragic deaths, Dr. McNamara also describes the pervasive, life-threatening conditions that detainees endure in Salvadorean prisons. He opines that "the risk of severe harm or death if imprisoned is acute." *See Cole v. Holder*, 659 F.3d 762, 773–74 (9th Cir. 2011) (explaining that the intentional maintenance of inhumane prison conditions could establish a CAT claim if they are used as a "form of punishment"). Detainees face the constant threat of violence by prison guards.[2]

---

[2] To the extent the majority holds that Artiga-Morales did not exhaust his claim that he faces a risk of harm by gang members and guards in prison, Maj. at 3, that is incorrect. Artiga-Morales expressly argued before the IJ and BIA that he feared torture in detention due to conditions of confinement and the risk of severe physical

3

One detainee claimed that prison guards beat him, and that he witnessed guards brutally beat another detainee to death, causing broken ribs and a punctured lung. Former gang members also face the persistent threat of violence by current gang members—who view gang membership as a lifetime commitment and any departure as an act of disobedience. Gang members have utilized the mixed prison population to "enact revenge against former gang members," causing many detainees to die from gang attacks. Detainees are further subject to inadequate food supplies, inadequate medical care and denial of critical medications, and harsh, unsanitary living conditions, including contaminated drinking water, no mattresses to sleep on, and outbreaks of serious diseases like tuberculosis, pneumonia, scabies, COVID-19, and HIV.

Even more disturbing, Dr. McNamara details the massive overcrowding issues in Salvadorean prisons, where prisons were at an occupancy rate of 118 percent of capacity as of April 2021.[3] The government argues that the Salvadorean government

---

and mental harm—which encompasses harm by gang members and guards in prison. *See Bare v. Barr*, 975 F.3d 952, 960 (9th Cir. 2020) (holding that a petitioner need only raise a general argument in administrative proceedings for exhaustion and may raise a more specific legal issue on appeal); *Shen v. Garland*, 109 F.4th 1144, 1158 (9th Cir. 2024).

[3]    Dr. McNamara's report suggests that the overcrowding issues have worsened during the state of emergency, when 65,000 additional prisoners were added to the prison population, with a total of around 101,500 people being held in detention—making El Salvador the country with the largest prison population per inhabitants in the world.

built a new mega-prison to "alleviate" these overcrowding issues. But conditions at this new mega-prison, the Terrorism Confinement Center (CECOT), appear just as bad if not worse than the other prisons. At CECOT, each prison cell will hold 100 detainees with access to only two toilets; a detainee only has an average of 0.6 square meters of individual space, which is far below the international standards for humane treatment in detention facilities. The government has also constructed "punishment" cells, which are sensory deprivation chambers where detainees are confined in complete darkness. The government is forcing families to provide detainees with supplemental food and hygiene packets that will cost them $170 per month—50 percent of the monthly Salvadorean minimum wage.

Further, there is no doubt that the Salvadorean government created these horrific prison conditions for the specific purpose of inflicting suffering. *See Rivera-Trigueros v. Bondi*, No. 24-3764, 2025 WL 1189561, at \*2 (9th Cir. Apr. 24, 2025) (holding that the petitioner's proffered evidence of "squalid conditions in Salvadoran prisons—which include extreme overcrowding, inadequate sanitation, and a lack of food" were "deliberately inflicted by government officials as a form of punishment."). These conditions have repeatedly been broadcasted by President Bukele and his administration "to project an image of ruthlessness towards those accused and convicted of crimes in El Salvador." President Bukele has posted numerous videos and messages on social media of terrified detainees "forced to

5

assume demeaning subordinate positions," celebrating the overcrowded, unsanitary, and unsafe prison conditions in the country. According to Dr. McNamara, "[i]nadequate food supplies and refusing to provide adequate medical care are *intentional measures* ordered by President Bukele." *See Cole*, 659 F.3d at 774 (noting that "the *intentional* denial of medical care as a form of punishment could suffice to establish a CAT claim").

Considering all evidence relevant to the possibility of future torture, *Garcia v. Holder*, 749 F.3d 785, 791 (9th Cir. 2014), the record compels the conclusion that Artiga-Morales will more likely than not be tortured by the Salvadorean government if removed and is entitled to CAT relief. *See Avendano-Hernandez*, 800 F.3d at 1079. If these horrific and inhumane prison conditions do not constitute torture, it is hard to imagine what does.

Because even the majority agrees that the "evidence establishes that the Salvadoran government is targeting individuals, like Artiga-Morales," Maj. at 2, and thus he will more likely than not be detained and tortured in prison, I would grant Artiga-Morales's petition for review.