**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| TUMAINE UTOLITI,<br><br>Petitioner,<br><br>v.<br><br>PAMELA BONDI, Attorney General,<br><br>Respondent. | Nos. 23-2767<br>24-5970<br><br>Agency No.<br>A217-057-349<br><br>MEMORANDUM[*] |

On Petition for Review of Orders of the
Board of Immigration Appeals

Argued & Submitted October 9, 2025
San Francisco, California

Before: S.R. THOMAS, NGUYEN, and BRESS, Circuit Judges.
Partial Concurrence and Partial Dissent by Judge BRESS.

Tumaine Utoliti petitions for review of two orders of the Board of

Immigration Appeals ("BIA"), which have been consolidated for our

consideration. The first petition, No. 23-2767, seeks review of the agency decision

denying petitioner's application for relief under the Convention Against Torture

---

[*] This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

("CAT") and related relief. The second petition, No. 24-5970, seeks review of the BIA's denial of petitioner's motion to reopen on grounds of ineffective assistance of counsel. We have jurisdiction pursuant to 8 U.S.C. § 1252. We deny the first petition, and grant the second petition. Because the parties are familiar with the history of the case, we need not recount it here.

I

A

In petition 23-2767, substantial evidence supports the BIA's determination that Utoliti failed to establish that he was "more likely than not" to be tortured if removed to Uganda and, thus, was ineligible for protection under CAT as codified in 8 C.F.R. § 1208.17. The agency agreed that Utoliti had been previously tortured in Uganda. However, substantial evidence supports the BIA's conclusion that Utoliti's circumstances have significantly changed since he left Uganda as a child refugee. *Nuru v. Gonzales*, 404 F.3d 1207, 1218 (9th Cir. 2005) (noting that changed circumstances can render a petitioner ineligible for CAT relief). If Utoliti was returned to Uganda, he would be entering under the permission of the government and no longer living within a refugee camp. Contrary to Utoliti's contentions, neither the BIA nor the IJ improperly weighed the facts of the case.

2

B

The BIA properly concluded that Utoliti was not denied his due process rights before the immigration judge ("IJ"). The BIA properly concluded that Utoliti had waived his right to counsel in his removal hearing with the IJ and thus did not experience a violation of his due process rights on those grounds. Utoliti provided a knowing and voluntary affirmative waiver to his right to counsel in his hearing, indicating that he understood his rights. Utoliti was asked by the IJ several times whether he understood his rights and was offered additional opportunities to pause the hearing until he found counsel; yet each time, Utoliti told the IJ that he wished to continue with the hearing. Collectively, Utoliti's words and actions indicate he knowingly and voluntarily waived his right to counsel. As such, the IJ did not violate the petitioner's due process rights in continuing the proceedings without counsel.

The BIA also properly concluded that the IJ had sufficiently developed the record in Utoliti's case, and thus, had not violated Utoliti's right to a fair hearing. When a noncitizen in a removal proceeding is *pro se*, "the IJ has an obligation to fully develop the record," providing a "scrupulous[] and conscientious[] probe into . . . all the relevant facts." *Zamorano v. Garland*, 2 F.4th 1213, 1226 (9th Cir. 2021) (citation modified). Here, the record shows that the IJ asked probative and

3

thorough questions about various aspects of the claim to both Utoliti and his mother during his hearing. The questioning was sufficient to satisfy the IJ's obligation to develop the record. *See Zetino v. Holder*, 622 F.3d 1007, 1014–15 (9th Cir. 2010) (as amended) (holding an IJ's inquiry sufficient under similar circumstances). Thus, the proceeding was not "so fundamentally unfair that [the petitioner] was prevented from reasonably presenting his case." *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 620–21 (9th Cir. 2006) (citation modified).

C

Utoliti failed to exhaust his challenges to the IJ's determinations that his conviction was a crime involving moral turpitude ("CIMT") and a particularly serious crime ("PSC"), as he had not raised either issue with the BIA upon appeal. Thus, Utoliti's claims are not exhausted, and because the government has properly raised exhaustion in its briefing, we cannot consider them. *Suate-Orellana v. Garland*, 101 F.4th 624, 629 (9th Cir. 2024) (holding that this court "must enforce" the exhaustion requirement "if a party 'properly raise[s]' it." (quoting *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 549 (2019))).

4

II

In the second petition, No. 24-5970, we conclude that the BIA erred in denying Utoliti's motion to reopen. Utoliti claims that his counsel was ineffective in not challenging his PSC or CIMT determinations from the IJ upon appeal to the BIA.

A

The BIA erred in concluding that Utoliti had failed to comply with the BIA's *Matter of Lozada* requirements. *See* 19 I. & N. Dec. 637, 638 (BIA 1988). The BIA faulted Utoliti for not filing a bar complaint against his attorney, as required by *Lozada*. However, the *Lozada* requirements "are not sacrosanct," and these requirements need not be applied when ineffective assistance of counsel is clear and obvious. *Ray v. Gonzales*, 439 F.3d 582, 588 (9th Cir. 2006). Here, counsel supplied an affidavit admitting his mistakes in Utoliti's case under the penalty of perjury. The declaration is sufficient to "explain why no such complaint was filed." *Iturribarria v. I.N.S.*, 321 F.3d 889, 900 (9th Cir. 2003); *see also Correa-Rivera v. Holder*, 706 F.3d 1128, 1133 (9th Cir. 2013) (explaining that demonstration of exposure to a malpractice claim is sufficient).

B

Having met the *Lozada* requirements, Utoliti is also required to show that there has been "inadequate performance and prejudice" to the extent that his ineffective counsel "may have affected the outcome of the proceedings." *Martinez-Hernandez v. Holder*, 778 F.3d 1086, 1088 (9th Cir. 2015) (citation modified).

1

The BIA erred in concluding that Utoliti failed to establish prejudice in its determination that his counsel could not have succeeded in challenging the IJ's conclusion that his crime qualified as a CIMT. A CIMT is a removable offense under 8 U.S.C. § 1227(a)(2)(A)(i). CIMTs include "two essential elements: reprehensible conduct and a culpable mental state." *Matter of Silva-Trevino*, 26 I. & N. Dec. 826, 834 (BIA 2016). To determine whether a crime is a CIMT, we employ the categorical approach as set forth in *Taylor v. United States*, 495 U.S. 575, 600–02 (1990). However, when the relevant statute used for conviction is overbroad and divisible, we apply the modified categorical approach as a tool to compare the elements of a statute of conviction to those of the generic offense. *See Descamps v. United States*, 570 U.S. 254, 263–65 (2013). Under both the categorical and modified categorical approaches, we determine "whether

the elements of the offense of conviction (as opposed to the facts underlying the conviction) constitute a crime involving moral turpitude." *Altayar v. Barr*, 947 F.3d 544, 549 (9th Cir. 2020). To qualify as a CIMT, "the full range of conduct encompassed by the criminal statute [must] constitute[] a crime of moral turpitude." *Id.* (quoting *Lozano-Arredondo v. Sessions*, 866 F.3d 1082, 1086 (9th Cir. 2017)).

In *Altayar v. Barr*, we held that A.R.S. § 13-1203(A) and A.R.S. § 13-1204(A) were divisible and, as such, the modified categorical approach should be utilized to determine whether a conviction under those statutes is a CIMT. *See id.* at 549–50. As a part of our analysis in *Altayar*, we specifically weighed the mens rea and "contemplated bodily harm associated" with the applied statutes. *Id.* at 554. In *Altayar*, we held that "as the level of conscious behavior decreases, i.e., from intentional to reckless conduct, more serious resulting harm is required in order to find that the crime involves moral turpitude." *Id.* at 554 (quoting *Leal v. Holder*, 771 F.3d 1140, 1146 (9th Cir. 2014) (citation modified)). In *Altayar*, the petitioner was convicted under A.R.S. § 13-1203(A)(2), which requires "[i]ntentionally placing another person in reasonable apprehension of imminent physical injury." *Id.* at 549-50. In contrast, Utoliti pled guilty under A.R.S. § 13-1203(A)(3), which requires only "[k]nowingly touching another

7

person with the intent to injure, insult or provoke such person."

A.R.S. § 13-1203(A)(3). Thus, Utoliti was convicted under a lower mens rea, and of less serious resulting harm, than the petitioner in *Altayar*. In *Uppal v. Holder*, we held that, "under the BIA's case law and our own, an assault statute *not* involving a specific intent to injure or a special trust relationship and *not* requiring that the assault cause death or even serious bodily injury cannot qualify as a categorical CIMT." 605 F.3d 712, 719 (9th Cir. 2010). As such, insult or provocation, including with the use of a deadly weapon or dangerous instrument, is not enough to make a conviction a CIMT.

We are required to consider whether "the full range of conduct encompassed by" A.R.S. § 13-1203(A)(3) constitutes a CIMT. *Altayar*, 947 F.3d at 549. (quoting *Lozano-Arredondo*, 866 F.3d at 1086). Because the conduct proscribed in A.R.S. § 13-1203(A)(3)—knowingly touching another with the intent to insult or provoke, including with the use of a deadly weapon or dangerous instrument— "is broader than" the definition of a CIMT, Utoliti's conviction is not a categorical CIMT. *Id*. at 550 (quoting *Leal v. Holder*, 771 F.3d 1140, 1145 (9th Cir. 2014)). Thus, the BIA erred in holding that Utoliti could not establish prejudice by his counsel's failure to raise the issue.

The BIA also erred in determining that Utoliti's counsel could not have succeeded in challenging the IJ's determination that the crime constituted a "particularly serious crime," disqualifying him from relief. If a conviction is a PSC, the noncitizen is ineligible for asylum or withholding relief. *Dominguez v. Barr*, 975 F.3d 725, 740 (9th Cir. 2020). For asylum purposes, a conviction constitutes a *per se* PSC when it is an aggravated felony. *Id*. For withholding of removal claims, "aggravated felonies are only *per se* particularly serious crimes when punished by a term of incarceration of at least five years." *Id*.

Utoliti did not commit an aggravated felony; thus, his conviction was not a *per se* PSC barring him from asylum-based relief. An aggravated felony requires a "term of imprisonment [of] at least one year" per 8 U.S.C. § § 1101(a)(43)(F), and Utoliti was only imprisoned for 121 days with three years of probation.

A conviction may constitute a *non per se* PSC thereby disqualifying the petitioner from withholding of removal and asylum-based relief upon a review of the factors laid out in the *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (BIA 1982). "'[A] crime is particularly serious if the nature of the conviction, the underlying facts and circumstances[,] and the sentence imposed *justify the presumption that the convicted immigrant is a danger to the community*.'" *Gomez-*

*Sanchez v. Sessions*, 892 F.3d 985, 991 (9th Cir. 2018) (quoting *Alphonsus v. Holder*, 705 F.3d 1031, 1041 (9th Cir. 2013) (citation modified)).  An analysis of the *Frentescu* factors is done on a case-by-case basis and can include any relevant and reliable evidence, such as conviction records, sentencing information, and beyond.  *See Anaya-Ortiz v. Holder,* 594 F.3d 673, 677–79 (9th Cir. 2010).

Here, the plea agreement and the sentence imposed specifically state that the offense was "a non-dangerous, non-repetitive offense under the criminal code." Thus, the criminal records do not establish that Utoliti was "a danger to the community."  The BIA did not appear to take this determination into account in its analysis, nor did it conduct a factual examination. The BIA simply conducted an elements-based approach, and used the wrong elements of Utoliti's conviction. Specifically, the BIA stated that "the elements of the attempted aggravated assault conviction, which required that the respondent attempted to intentionally place another person in reasonable apprehension of imminent physical injury with the use of a deadly weapon or dangerous instrument, bring the crime into the ambit of a particularly serious crime."  However, the BIA appears to import the language "intentionally place another person in reasonable apprehension of imminent physical injury" from A.R.S. § 13-1203(a)(2), which Utoliti was not convicted under.  A.R.S. § 13-1203(a)(3), the correct subsection of the statute, requires only

10

"knowingly touching another person with the intent to injure, insult, or provoke such person." Because the BIA misconstrued the elements of the conviction and relied heavily on the elements in its analysis, the BIA abused its discretion in finding that Utoliti was convicted of a PSC. Thus, Utoliti was prejudiced by his previous counsel's failure to appeal the IJ's initial PSC determination.

## III

In sum, the petition to review the BIA's dismissal of appeal on order of removal in case No. 23-2767 is denied, and the petition to review the denial of the motion to reopen in case No. 24-5970 is granted. The petition for review in case No. 24-5970 is remanded to the BIA for further proceedings consistent with this disposition.

**PETITION FILED IN CASE NO. 23-2767 DENIED.**
**PETITION FILED IN CASE NO. 24-5970 GRANTED AND REMANDED.**

*Utoliti v. Bondi*, Nos. 23-2767 & 24-5970

BRESS, Circuit Judge, concurring in part and dissenting in part:

I agree that Utoliti's first petition for review should be denied. But I would also deny Utoliti's second petition because the BIA did not err in concluding that Utoliti was not prejudiced by his counsel's failure to argue the crime involving moral turpitude ("CIMT") and particularly serious crime ("PSC") issues. Utoliti's crime of conviction was both a CIMT and a PSC, so the BIA did not abuse its discretion in denying his motion to reopen. The majority errs in concluding otherwise.

I

Utoliti was convicted of attempted aggravated assault under Ariz. Rev. Stat. § 13-1203(A)(3) and § 13-1204(A)(2). Section 13-1203(A)(3) provides that a person commits assault by "[k]nowingly touching another person with the intent to injure, insult or provoke such person." Section 13-1204(A)(2) provides that aggravated assault is committed "[i]f the person uses a deadly weapon or dangerous instrument" while committing the assault. Arizona law defines a deadly weapon as "anything designed for lethal use," Ariz. Rev. Stat. § 13-105(14), and a dangerous instrument as "anything that . . . is readily capable of causing death or serious physical injury." *Id.* § 13-105(15). Under the modified categorical approach, Utoliti's crime of conviction is a CIMT under our precedents, making him removable under 8 U.S.C. § 1227(a)(2)(A)(i).

1

In *Altayar v. Barr*, 947 F.3d 544 (9th Cir. 2020), we held that a different part of the Arizona assault statute that criminalized "[i]ntentionally placing another person in reasonable apprehension of imminent physical injury," Ariz. Rev. Stat. § 13-1203(A)(2), was a CIMT when combined with the same "deadly weapon or dangerous instrument" aggravator under which Utoliti was convicted. *Altayar*, 947 F.3d at 551–55. The majority concludes here that § 13-1203(A)(3), which criminalizes "[k]nowingly touching another person with the intent to injure, insult or provoke such person," is less turpitudinous than § 13-1203(A)(2). The majority points to two factors: the supposedly lower *mens rea* required under § 13-1203(A)(3) and a theoretically lower level of contemplated bodily harm. Setting aside that *Altayar* did not create a floor for what qualifies as a CIMT, neither factor is sufficient to take this case outside of *Altayar*'s reasoning.

As an initial matter, the *mens rea* requirements in § 13-1203(A)(2) and § 13-1203(A)(3) are not materially different. While the *mens rea* for "touching another person" is "knowingly" instead of "intentionally," the *mens rea* for "injur[ing], insult[ing], or provok[ing]" is "with intent to," which is equivalent to "intentionally" under Arizona law. Ariz. Rev. Stat. § 13-105(10)(a). There is little difference between a perpetrator "knowingly" or "intentionally" touching another person using a deadly weapon or dangerous instrument. Instead, the crux of § 13-1203(A)(3)— from which the most contemplated harm arises—is touching "with the intent to

2

injure, insult, or provoke," because an intent to injure, provoke, or insult through the touch of a deadly weapon risks imminent escalation into a potentially deadly confrontation. That part of the statutory provision has a *mens rea* of "intent," just like § 13-1203(A)(2), the section at issue in *Altayar*. Therefore, the *mens rea* element in § 13-1203(A)(3) is only marginally lessened, if at all, as compared to *Altayar*.

The level of contemplated bodily harm does not change the analysis. While the majority focuses on the fact that the least-culpable conduct under § 13-1203(A)(3) is to "touch[ ] . . . with the intent to . . . insult, or provoke," *id.*, that conduct still "expose[s] the [victim] to a risk of serious bodily injury" when done using a deadly weapon or dangerous instrument. *Altayar*, 947 F.3d at 554 (quoting *Fugow v. Barr*, 943 F.3d 456, 459 (9th Cir. 2019)). In *Altayar*, it was the § 13-1204(A)(2) deadly weapon or dangerous instrument aggravator that made the critical difference in distinguishing the crime of conviction from simple assault. *Id.* at 552 ("[T]he BIA could properly regard an aggravated assault with a deadly weapon or dangerous instrument as substantially more turpitudinous than a mere simple assault."). So too here. As the majority would have it, brandishing a knife at a person with the intent to cause fear of imminent physical harm would be a CIMT under the combination of statutory provisions at issue in *Altayar*, yet touching a

3

person while using the same knife, with an intent to injure, provoke, or insult, would not. The law does not demand that illogical result.

Indeed, if anything, the statute of conviction here contemplates a *greater* risk of harm because it actually requires the defendant to "[k]nowingly touch" the victim while using a deadly weapon or dangerous instrument. Ariz. Rev. Stat. §§ 13-1203(A)(3), 13-1204(A)(2). Our decision in *Uppal v. Holder*, 605 F.3d 712 (9th Cir. 2010), on which the majority relies, does not change matters because it recognizes that assault statutes involving aggravating factors—including "the use of a deadly weapon"—have qualified as CIMTs. *Id.* at 717.

For these reasons, Utoliti's crime of conviction was a CIMT.

II

The majority also concludes that counsel's failure to raise the PSC issue was prejudicial. The majority's reasoning is again mistaken. Utoliti's crime was a PSC, rendering him ineligible for asylum and withholding of removal. *Delgado v. Holder*, 648 F.3d 1095, 1101–02 (9th Cir. 2011).

For convictions that are not *per se* particularly serious crimes, the BIA considers the crime of conviction under *Matter of Frentescu*, 18 I. & N. Dec. 244 (BIA 1982), looking to "such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that

4

the [individual] will be a danger to the community." *Id.* at 247. In evaluating the agency's PSC decision, "our review is limited to ensuring that the agency relied on the appropriate factors and proper evidence to reach this conclusion. We may not reweigh the evidence and reach our own determination about the crime's seriousness." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1077 (9th Cir. 2015) (internal citations and quotations omitted).

Here, the IJ properly considered the *Frentescu* factors and did not err in finding that Utoliti's conviction was a PSC based on Utoliti driving a vehicle at high speed while drunk, attempting to hit police officers while doing so, and fleeing afterwards. The BIA likewise considered the facts of Utoliti's crime and agreed that it was a PSC. There is no basis for rejecting the agency's evaluation of Utoliti's disturbing criminal misconduct.

The majority's reasons for granting the petition on this point are unsound. The majority first decides that the BIA "simply conducted an elements-based approach." But the "elements-based approach" that the majority takes issue with was merely to determine whether the crime could be brought "into the ambit of a particularly serious crime." Under our precedents, the BIA *must* examine "the elements of the offense" to make that determination. *Anaya-Ortiz v. Holder*, 594 F.3d 673, 677 (9th Cir. 2010) (quoting *Matter of N-A-M-*, 24 I. &. N. Dec. 336, 342 (BIA 2007)). While the majority's argument would have force if the ambit analysis was the *only* analysis

5

conducted by the agency, the BIA properly conducted a *Frentescu* analysis afterwards by considering "(1) the nature of the conviction, (2) the type of sentence imposed and (3) the circumstances and underlying facts of conviction." The BIA specifically discussed the facts of Utoliti's case, which belies the majority's assertion that the agency failed to "conduct a factual examination."

The majority suggests that the BIA's ambit analysis was flawed because the agency quoted language from § 13-1203(A)(2) instead of § 13-1203(A)(3) when making its ambit determination. But this mistake appears to be a scrivener's error. In its earlier analysis on whether Utoliti's conviction was a CIMT, the BIA thoroughly analyzed the elements of Utoliti's conviction based on § 13-1203(A)(3) and determined that it qualified. The record, read as a whole, indicates that the BIA understood that Utoliti was convicted under § 13-1203(A)(3) and analyzed his conviction as such. The majority does not suggest that § 13-1203(A)(3) cannot fall within the ambit of a PSC. Therefore, the BIA did not abuse its discretion, and even if it did, the error was harmless.

Finally, the majority suggests that the BIA failed to consider the plea agreement's characterization of Utoliti's offense as a "non-dangerous, non-repetitive offense." As an initial matter, it appears that Utoliti never raised this argument before the BIA in his motion to reopen. But even if we consider this untimely argument, the majority ignores what these classifications mean under Arizona law.

6

Utoliti's plea agreement stated that his offenses were "non-dangerous, non-repetitive offenses *under the criminal code*." (emphasis added). Put simply, these statements are simply boilerplate statutory classifications—not a case-specific evaluation of his conviction.

For instance, under Ariz. Rev. Stat. § 13-105(13), a "dangerous offense" is "an offense involving the discharge, use or threatening exhibition of a deadly weapon or dangerous instrument or the intentional or knowing infliction of serious physical injury on another person." *Id.* The "non-dangerous" designation in the plea agreement simply reflects the fact that neither of the statutory provisions under which Utoliti was convicted—§ 13-1203(A)(3) and § 13-1204(A)—necessarily involved the "discharge, use, or threatening exhibition" of such a weapon or instrument. Ariz. Rev. Stat. § 13-105(13). But that does not mean that Utoliti's crime was not particularly serious under the *Frentescu* factors.

The "non-repetitive" designation, meanwhile, has nothing to do with the offense itself—the designation is based on whether the offender is a repeat offender. Ariz. Rev. Stat. § 13-703. Utoliti was a first-time offender, which presumably explains why the plea agreement characterized his offense as "non-repetitive." Accordingly, nothing in the plea agreement undermines the agency's PSC determination.

\*     \*     \*

7

For the foregoing reasons, I respectfully dissent from the decision to grant Utoliti's second petition for review.